**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ZHIRAYR LALAYAN, AGHUNIK YEGHIAZARYAN, SERZH LALAYAN, SAMSON LALAYAN, and A.L., *Petitioners*, <br><br> v. <br><br> MERRICK B. GARLAND, Attorney General, *Respondent*. | No. 18-73062 <br><br> Agency Nos. <br> A208-601-349 <br> A208-601-286 <br> A208-601-287 <br> A208-601-288 <br> A208-601-289 <br><br> OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 11, 2021
San Francisco, California

Filed July 13, 2021

Before: J. Clifford Wallace, Ronald M. Gould, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Wallace

**SUMMARY**[*]

**Immigration**

Denying Zhirayr Lalayan, his wife Aghunik Yeghiazaryan, and their children's petition for review of the Board of Immigration Appeals' decision affirming an immigration judge's denial of asylum, withholding of removal, and protection under the Convention Against Torture, the panel held that substantial evidence supported the adverse credibility determination as to Lalayan, based on implausibilities in the record, and as to Yeghiazaruan, based on her evasive and non-responsive testimony, and that substantial evidence supported the denial of withholding and CAT relief.

The panel first clarified the law concerning implausibility findings. The panel explained that inherent plausibility in the context of adverse credibility determinations refers to the inherent believability of testimony in light of background evidence. The panel wrote that an IJ must provide specific and cogent reasons, including citations to record evidence, in support of an implausibility finding, and may not base that finding on speculation or conjecture. In addition, the IJ must provide a witness an opportunity to explain a perceived implausibility during the merits hearing. The panel wrote that the cited evidence in the record, including a witness's own testimony, need not conclusively establish that the witness's testimony is false, and the IJ's implausibility finding will ultimately

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

hinge on the application of a reasonable evaluation of the testimony and evidence based on common sense. The panel explained that this mix of constraints and flexibility enables an IJ to challenge a witness on a perceived implausibility and discredit unbelievable testimony, while guarding against unwarranted assumptions that are untethered from evidence in the record or based not on common sense but rather on cultural differences. Applying that framework to the agency's implausibility determination, the panel concluded that the IJ reasonably applied common sense, gave specific and cogent reasons for finding Lalayan's testimony implausible, and provided Lalayan ample opportunity to address the perceived implausiblities. The panel held that evidence therefore did not compel reversal of the adverse credibility determination as to Lalayan.

The panel also held that substantial evidence supported the IJ's adverse credibility determination as to Yeghiazaryan based on her evasive and non-responsive testimony. Observing that the Board characterized this finding as a demeanor finding, and that this circuit has similarly characterized evasiveness and non-responsiveness as demeanor findings, the panel recognized that the REAL ID Act differentiates between the demeanor and responsiveness of a witness. The panel wrote that regardless of how the agency characterized the finding, however, the special deference this circuit provides for demeanor findings was not relevant here, because such deference applies only to non-verbal, and therefore non-textual, factors, and the IJ's determination was based on verbal factors which were clear from the text of the hearing transcript. The panel wrote that the IJ's finding was based on numerous identified instances of Yeghiazaryan's evasiveness and non-responsiveness. The panel also concluded that the IJ provided Yeghiazaryan fair notice of any perceived evasiveness and non-

responsiveness by asking repeated questions on the point of concern, and admonishing Yeghiazaryan for not answering the question.

The panel held that substantial evidence supported the agency's denial of withholding of removal and CAT protection. First, the panel explained that the credibility determination was dispositive as to past persecution. As to future persecution, the panel concluded that it was not clear that Lalayan holds the political opinion for which he claimed he would be persecuted, and while the country reports and news articles indicated that political corruption and human rights abuses exist in Armenia, they failed to establish that Lalayan would more likely than not be persecuted upon removal to Armenia on account of his stated political opinion. Recognizing that an adverse credibility determination does not, by itself, necessarily defeat a CAT claim, the panel agreed with the agency that the country reports failed to establish that Lalayan faced a particularized risk of torture.

**COUNSEL**

Artem M. Sarian (argued), Sarian Law Group APLC, Glendale, California, for Petitioners.

Colin J. Tucker (argued), Trial Attorney; Song Park, Acting Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

WALLACE, Circuit Judge:

Petitioners Zhirayr Lalayan (Lalayan), his wife Aghunik Yeghiazaryan (Yeghiazaryan), and their three children Serzh Lalayan, Samson Lalayan, and A.L., a minor, (collectively, the Petitioners) seek review of the final order of the Board of Immigration Appeals (Board or BIA), which affirmed the Immigration Judge's (IJ) denial of Lalayan's applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).[1]  We have jurisdiction pursuant to 8 U.S.C. § 1252.  "We review factual findings, including adverse credibility determinations, for substantial evidence." *Garcia v. Holder*, 749 F.3d 785, 789 (9th Cir. 2014).  "Factual findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.*, *quoting* 8 U.S.C. § 1252(b)(4)(B). "When the BIA conducts its own review of the evidence and law . . . , our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010) (citation and quotation marks omitted).  We deny the petition.

I.

The Petitioners are natives and citizens of Armenia.  On or about November 28, 2015, they entered the United States from Mexico and applied for admission at the port of entry at San Ysidro, California.  The Department of Homeland Security served the Petitioners with Notices to Appear in

---

[1] The Board also denied the Petitioners' motion to terminate proceedings.  The Petitioners do not challenge that decision on appeal.

immigration court, which alleged that they did not possess valid United States entry documents and charged them with removability pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). On May 27, 2016, the Petitioners appeared before the IJ represented by counsel, admitted to the notices' allegations, and conceded that they were removable. Lalayan submitted applications for asylum, withholding of removal, and CAT protection, and he identified the other Petitioners as derivative beneficiaries.

In the applications, Lalayan claimed that he was persecuted in Armenia because of his political opinion and that he fears that he will be persecuted and tortured if removed to Armenia. In his declaration in support of his applications, Lalayan described harm that he and his family suffered after he reported members of the Yerkrapah Volunteer Union (the Union) for embezzling aid provided by the United Methodist Committee on Relief (UMCOR) intended for Armenians in need.

On October 17, 2016, the IJ conducted the first of two merits hearings. Lalayan testified that in 2001, he began working as a driver for the Armenia mission of UMCOR, a global non-profit organization headquartered in New York. According to Lalayan, one of the mission's objectives is to provide aid to lower income families, sometimes through intermediary Armenian organizations. In 2008, Lalayan was promoted to the position of warehouse officer. In addition to working for UMCOR, Lalayan had been a member of the Union since 1997. According to Lalayan, the Union was founded to help "families of those warriors who were killed during" the Nagorno-Karabakh War, as well as disabled persons and other lower-income families. Lalayan testified that the Union now wields "very strong . . . political power" in Armenia. The Union receives aid from UMCOR and

distributes it among its members and their families. In 2014, Lalayan was appointed as the vice chairman of the Union's Avan branch.

In the summer of 2015, Lalayan received a job offer for a one-year position in Mexico, and in October 2015, he traveled to Mexico for about two weeks to learn more about the position. Upon returning to Armenia, Lalayan prepared to move to Mexico to start the new position and notified UMCOR and the Union of his plans. Lalayan gathered records related to his positions at UMCOR and the Union to present to the persons who would take over his responsibilities at each organization. Lalayan testified that when he reviewed those records, he discovered the Union's practice of embezzling a portion of the UMCOR aid intended for families in need. On November 4, 2015, Lalayan filed a complaint with the prosecutor general of Armenia regarding the Union's alleged embezzlement. He reported that three Union members broke into his house that same day and forced him to the office of Union chairman Manvel Grigoryan, a retired general and former lawmaker in Armenia's National Assembly. He testified that while at Grigoryan's office, Petros Amiryan, the chairman of the Union's Avan branch and Lalayan's Union supervisor, beat Lalayan and threatened to kill him. Lalayan stated that Grigoryan threatened to "vanish [his] family" if Lalayan did not withdraw his complaint with the prosecutor general's office. After returning home, Lalayan decided not to withdraw his complaint because he "wanted to go all the way . . . so that they would be punished." On November 5, 2015, Lalayan received a telephone call during which the caller threatened to kill Lalayan if he did not withdraw the complaint. Lalayan stated that on November 6, 2015, men in police uniforms broke into his house and beat him, Yeghiazaryan, and their son Serzh Lalayan. The men

demanded the original accounting records, copies of which Lalayan had attached to his complaint. The men eventually secured the documents, ordered Lalayan to withdraw the complaint, and threatened to kill his family.

On November 17, 2015, the Petitioners flew from Armenia to Russia. They then traveled to Cuba and to Mexico on November 26, 2015, and ultimately to the United States on November 28, 2015. Lalayan testified that the police questioned his parents about his whereabouts after he left Armenia and beat his father.

During cross-examination, Lalayan was questioned about the plausibility of several portions of his account. First, the government questioned Lalayan about how he could have discovered the Union's embezzlement scheme only just before his scheduled departure from Armenia, after working as an UMCOR warehouse officer for seven years. Lalayan responded that when he prepared to leave his job at UMCOR, he requested that the Union submit its distribution list so that he could share it with the person replacing him at UMCOR. According to Lalayan, the Union only submitted two "very informal papers" that raised his concerns. The government asked Lalayan when he last requested the Union to submit records of its aid distribution. Lalayan testified that he had never previously obtained such distribution records from the Union and explained that whenever the Union "submitted the list, they were submitting that and turning [that] in. But because I was leaving[,] at that time is the first time that I looked at this list, so that it wouldn't be my responsibility to turn it in." However, on redirect examination, Lalayan indicated that he regularly reviewed distribution records of the various organizations that received aid from UMCOR. When Lalayan's counsel asked whether he was "responsible for the [warehouse's]

accounting or [if] there were other people who were also taking in . . . the distribution sheets," Lalayan testified that organizations seeking UMCOR aid "would come to the office and submit the request. And if there were any kind of discrepancies, then I would ask them to submit new papers." Lalayan explained that he was "in charge of [the] warehouse at UMCOR . . . , and a lot of people knew me . . . as a diligent person. So, I wanted to submit everything correct." Finally, Lalayan's counsel asked him to confirm that the Union "basically received the benefits from UMCOR and [Lalayan] also had an obligation for UMCOR to give the complete details of the accounting," and Lalayan answered, "Yes."

Second, the government questioned Lalayan about why he had not reported his concerns about the Union's embezzlement to anyone at UMCOR's Armenia mission or its headquarters in the United States. When the government asked if Lalayan reported his suspicions about the Union's embezzlement to the workers in the UMCOR warehouse in Armenia, Lalayan answered that he did not "[b]ecause I was not dealing with paperwork." The government also questioned Lalayan about why he felt obligated to report the embezzlement when he was about to leave for another job in Mexico, and Lalayan stated, "That's my nature, probably. I always help people. I was [a] deputy at [the Union] and a lot of people knew me, and I wanted to make clear that I wasn't involved in all that." When the government asked Lalayan why he did not report his concerns to the UMCOR's headquarters in New York after he arrived in the United States, Lalayan responded, "I didn't see the reason to do that."

In addition to the government's cross-examination, the IJ also questioned Lalayan extensively about his decision not

to report his concerns to UMCOR. When the IJ asked
Lalayan why he had not reported his concerns to UMCOR,
Lalayan replied, "I didn't want that organization to close
down." When the IJ asked why Lalayan thought that
UMCOR would end the Armenia mission's operations if he
reported his concerns, Lalayan answered that the news of the
Union's "false activity" might cause UMCOR to reconsider
whether it can help Armenian individuals in need. The IJ
then asked whether Lalayan thought that UMCOR would
eventually learn about Lalayan's complaint and the Union's
embezzlement during any investigation by the prosecutor
general. Lalayan responded, "First, I didn't think. I just let
prosecutor's office know about that. . . ." Finally, the IJ
asked whether Lalayan ever tried to contact anyone at
UMCOR's New York headquarters to alert the organization
about the embezzlement. Lalayan replied, "No, because I
didn't know the language and I wasn't very good at
computers, so I couldn't do it." With respect to a potential
language barrier, the government later asked why Lalayan
thought an organization that does work in Armenia would
not have at least one person who could speak Armenian, and
Lalayan answered, "I have very little time. That's probably
why I didn't follow up, didn't do more." The IJ pressed
Lalayan on his decision not to notify the UMCOR after
arriving in the United States. Specifically, the IJ asked why
Lalayan had not notified UMCOR of the Union's
embezzlement if, according to his testimony, Lalayan filed
his complaint because the embezzlement prevented aid from
reaching Armenian families in need. Lalayan replied, "I
took those actions as a deputy chief of [the Union's Avan]
chapter, not as a worker of UMCOR." He explained that he
was concerned not "that UMCOR's help is not getting there,
but about those people who stole those goods from [the
Union]." The IJ also pointed to a letter of recommendation
written in English that the head of UMCOR's Armenia

mission provided Lalayan before he left Armenia. In light of Lalayan's long history of employment with UMCOR outlined in the letter, the IJ again asked Lalayan why he did not notify UMCOR's headquarters of the Union's conduct, especially as it resulted in Lalayan being attacked on two occasions. Lalayan answered, "[I]t was my personal matter. Why would I bother people there?"

In addition, the IJ and government posed several questions to Lalayan that went to the timing of his decision to travel to the United States. The government asked him about his repeated attempts to obtain United States entry documents before finally entering the United States in November 2015. Lalayan testified that he had previously applied for a United States visa in 1998, 2007, 2013 and on November 2, 2015, just two days before the first event that gave rise to Lalayan's claims. He acknowledged that all four applications were denied. The IJ also questioned Lalayan about when he decided to turn down the job offer in Mexico and travel to the United States. Lalayan answered that he called the employer in Mexico from Russia a few days after departing Armenia to provide notice that he would not be taking the job. But when the government had asked Lalayan why he did not work in Mexico, he testified about his fear of persecution in Mexico and stated that members of Armenia's Republican Party have "people and properties over there" and that "[t]hey could have reached [him] over there." The IJ asked Lalayan why he obtained a letter of recommendation written in English just before leaving Armenia, if he intended at that point to work in Mexico. Lalayan answered, "It was kind of like an affidavit for the place I was working."

On February 24, 2017, the IJ conducted the second merits hearing. During this hearing, Yeghiazaryan generally

corroborated Lalayan's description of the attack at their home on November 6, 2015, and Lalayan's statement that men visited his parents' home after the Petitioners left Armenia. On cross-examination, the government questioned Yeghiazaryan about when Lalayan decided to decline the job offer in Mexico and when he notified the employer of that decision. Yeghiazaryan testified that she thought Lalayan made the decision some time after returning from Mexico on October 21, 2015. The government repeatedly asked Yeghiazaryan when, after returning from Mexico, Lalayan notified the prospective employer, and Yeghiazaryan answered that it was "[p]robably in November." When the IJ asked Yeghiazaryan how Lalayan notified the employer, Yeghiazaryan stated, "I don't know because most of the time he was not informing me or sharing with me, you know, the way he did things." On redirect examination, Yeghiazaryan's counsel asked her to explain again when Lalayan notified the prospective employer of his decision, and she answered, "That decision probably was made during the stay in Moscow. Or on the way, I don't know[,] . . . [b]ecause he was not telling me everything." On recross-examination, the government repeatedly questioned Yeghiazaryan about why Lalayan would not involve her in the decisions to decline the job offer and change the Petitioners' destination from Mexico to the United States, when both decisions would impact Yeghiazaryan's and the family's future. Yeghiazaryan stated, "Well, I cannot respond to this question because it's - I was afraid and scared a lot about the situation. At that time[,] he was trying to protect us and, you know, keep us aside out of those problems and troubles[.]"

The IJ repeatedly questioned Yeghiazaryan about whether Lalayan and Yeghiazaryan had always planned to travel to the United States:

IJ: Was it the plan all along to come to the United States?

Yeghiazaryan:  Well, all we knew that we were staying in Moscow just waiting for visas or temporary - those permits to enter Mexico to go and work there down on the road so the decision was made to turn down that position and we also knew that wherever we go they would be able to find us.  So.

IJ: You didn't answer my question.

Yeghiazaryan: Probably, I don't understand exactly-

IJ: Was the plan all along to come to the United States?

Yeghiazaryan: No, probably at the end my husband decided to come this way because this is the most democratic state - meaning the country where we could go - be and safe.

IJ: When was that decision made?

Yeghiazaryan: Probably on the way to Mexico.

IJ: When were you told?

Yeghiazaryan: Well, he was nervous in Moscow, he felt that – constantly he was told – he would keep saying I don't know, where

should we go?  You know so that finally we'd
be safe.

IJ: Ma'am, were you part of the decision
making to come to the United States?

Yeghiazaryan: No, mainly he was the one
who decided but we came together.

IJ: All right, and when did – when were you
told that you were coming to the United
States?

Yeghiazaryan: Probably in Mexico.

The IJ highlighted that the Petitioners were in Mexico only
for two days before entering the United States and asked
Yeghiazaryan to confirm that she learned of Lalayan's
decision to bring the family to the United States during those
two days.  Yeghiazaryan testified, "It's not that I found out
but, you know, I was more – it was more clear that that
decision was made."

## A.

In September 2017, the IJ denied Lalayan's applications
for asylum, withholding of removal, and CAT relief on the
grounds of adverse credibility determinations and Lalayan's
failure to submit objective evidence that established a well-
founded fear of future persecution or sufficient likelihood
that he would be tortured if removed to Armenia.

Although the IJ found that Lalayan's account of the
attacks were consistent, she determined that three elements
of Lalayan's testimony were implausible.  First, the IJ found
that it was implausible that Lalayan would file a complaint

with the prosecutor general's office about the Union's embezzlement but not notify UMCOR itself.  The IJ discussed at length the issues in Lalayan's explanation and cited his changing answers.  The IJ addressed Lalayan's stated concern that if UMCOR learned of the Union's embezzlement, it might end aid operations in Armenia.  The IJ determined that while Lalayan's "concerns [were] reasonable, his course of action [was] not," reasoning that filing a complaint with the prosecutor general's office about the Union's embezzlement would likely cause Armenian authorities to notify UMCOR, the victim of the embezzlement.  The IJ also addressed Lalayan's decision not to report his concerns about the Union's embezzlement to UMCOR's New York headquarters after arriving in the United States.  The IJ found that Lalayan's explanation that he lacked the technology skills and English proficiency to contact UMCOR's headquarters was unpersuasive.  She cited Lalayan's ability to obtain a letter of recommendation written in English from UMCOR and his evasive response to the government's question about whether UMCOR's headquarters would have access to at least one person proficient in Armenian.  Finally, the IJ cited the incongruity between, on one hand, Lalayan's decision to file the complaint and refusal to withdraw it because of his commitment to making sure the aid was delivered to Armenians in need and, on the other, his various explanations that he did not notify UMCOR of the embezzlement because he "didn't see a reason to do that," he took action as a representative of the Union not UMCOR, and he was not concerned with the distribution of UMCOR's aid to Armenians in need but rather the punishment of the Union.  The IJ concluded that Lalayan's "lack of interest in alerting UMCOR regarding the Union's embezzlement casts doubt on whether a complaint against the Union was ever filed with the prosecutor's office."

Second, the IJ found implausible that Lalayan, "a warehouse agent of seven years, never looked at the Union's distribution lists until he prepared to leave his position at UMCOR." The IJ cited Lalayan's "evasive and confusing" answer to government's questions about whether he had ever previously reviewed the Union's distribution records. The IJ also highlighted the letter of recommendation written by the Armenia mission head, which identified keeping inventory of and delivering UMCOR's aid as Lalayan's job responsibilities, Lalayan's testimony that he was responsible for keeping complete accounting records for the warehouse, and his testimony that he instructed organizations applying for UMCOR aid to correct their requests if he identified any discrepancies. The IJ reasoned it was implausible that Lalayan would not then "preserve that same diligence with the Union's documents." Lastly, the IJ stated that Lalayan's position as a vice chairman of the Union's Avan branch undermined his description of the events, because Lalayan "seem[ed] completely disconnected from the Union's undertakings."

Third, the IJ held Lalayan's narrative that he only decided to come to the United States after spending two days in Mexico "implausible given that the decision to leave Armenia and travel through several countries with an entire family is one that is unlikely to be made without minimal forethought." The IJ identified two bases for this finding. She found that Lalayan's multiple attempts to obtain United States entry documents evidenced a "long-standing intent to come to the United States" independent of his asylum claim. The IJ also determined that Lalayan's testimony describing his eventual decision to travel to the United States did "not present a cogent story." She emphasized that Lalayan decided in Russia that the Union would be able to harm him and his family in Mexico but then, despite believing Mexico

was not safe, traveled there anyway with his family without a plan to relocate safely.

The IJ also determined that Yeghiazaryan's testimony was not credible on two grounds. First, the IJ cited Yeghiazaryan's "vague, evasive, and non-responsive" answers in response to the IJ's repeated questions about when Lalayan decided to decline the job offer in Mexico and whether it was their plan all along to travel to the United States. Second, the IJ found it implausible that Lalayan and Yeghiazaryan, "a marriage of nearly seventeen years, would decide to leave Armenia and travel through three different countries without discussing the family's plans or future" and concluded that it is "unlikely that [Yeghiazaryan] would not have been made aware of such significant decisions." The IJ reasoned in part that Yeghiazaryan had applied with Lalayan for a United States visa on November 2, 2015, and that she had family members living in the United States.

Considering the objective evidence submitted in addition to Lalayan's and Yeghiazaryan's testimony, the IJ held that Lalayan has not established harm rising to the level of past persecution or a well-founded fear of future persecution.

The IJ denied Lalayan's claim for CAT relief on the grounds of the adverse credibility determinations and Lalayan's failure to provide objective evidence that he would more likely than not be tortured if removed to Armenia. The IJ determined that Lalayan failed to establish past torture. The IJ concluded that while the country condition reports and news articles submitted by Lalayan described "Armenia's ongoing challenges with government interference with freedom of assembly and political dissent," they did not establish that Lalayan will more likely than not be tortured for holding a political opinion.

B.

Lalayan appealed from the IJ's decision and challenged her adverse credibility determinations. On January 8, 2019, the Board dismissed Lalayan's appeal and affirmed the IJ's decision based on her adverse credibility determinations and Lalayan's failure to produce objective evidence to establish a well-founded fear of future persecution or likelihood of torture in Armenia. The Board cited the IJ's findings that Lalayan's testimony was implausible with respect to his decision to file a criminal complaint with the prosecutor general's office but not to notify UMCOR of the suspected embezzlement, Lalayan's discovery of the Union's embezzlement just before his scheduled departure to Mexico, and the timing of Lalayan's decision to travel to the United States. The Board generally incorporated the IJ's reasons for her implausibility findings regarding Lalayan's testimony; however, it did not cite the IJ's statement that Lalayan's 2014 appointment as vice chairman of the Union's Avan branch made it unlikely that he would have been unaware of any Union embezzlement scheme. The Board also upheld the IJ's adverse credibility determination with respect to Yeghiazaryan's testimony. It characterized the IJ's description of Yeghiazaryan's "vague, evasive, and non-responsive" answers as a "demeanor observation." The Board did not cite the IJ's finding that it was implausible Yeghiazaryan would not be involved in Lalayan's decision-making processes to decline the job offer in Mexico and to travel to the United States. The Board also affirmed the IJ's alternative holdings with respect to past persecution and the well-founded fear of future persecution, and it affirmed the IJ's denial of CAT relief because Lalayan's testimony and submitted objective evidence "did not demonstrate that he faces a particularized risk of torture."

II.

The decisions of the IJ and the Board (collectively, the Agency) relied in part upon the IJ's adverse credibility determinations, which were based on several implausibility findings as well as a finding regarding the way Yeghiazaryan answered questions. We address first the Agency's decisions with respect to the implausibility findings.

A.

Our case law addressing implausibility findings in the context of adverse credibility determinations can at times appear confusing or at odds with itself. In *Jibril v. Gonzales*, 423 F.3d 1129 (9th Cir. 2005), we compared four of our decisions upholding or rejecting what might seem like similar implausibility findings and concluded, "If there is a logical way to reconcile the first two decisions with the latter two, it is not obvious to us." *Id.* at 1136. Of course, one helpful response is that it is not the words said but whether they are believed. That is, the IJ not only hears words but must determine believability under the totality of the circumstances. That essential part of the process is not only about words that can be captured in a written record but also about a determination of believability based on aspects of testimony such as body language and tone that only the trier of the facts can fully evaluate.

Also, some of our decisions have blurred the distinction between inconsistency and implausibility. *See, e.g.*, *Lizhi Qiu v. Barr*, 944 F.3d 837, 845–46 (9th Cir. 2019); *see also Singh v. Lynch*, 802 F.3d 972, 976 (9th Cir. 2015) (holding that the petitioner's account of being attacked by Sikh militants was both implausible in light of and inconsistent with record evidence that Sikh militants had ended armed operations). In *Lizhi Qiu*, we held that substantial evidence

did not support any of the Agency's reasons for its adverse credibility determination, including the IJ's finding that a university student who had completed her studies in Indiana, was waiting to receive her diploma, and filed her asylum application in California could not plausibly reside in a state far from her university. 944 F.3d at 845. Although we held that the IJ's finding was based on speculation and conjecture, *see id.*, terms associated with impermissible implausibility determinations, *see Jibril*, 423 F.3d at 1135, we adopted the Agency's characterization of the issue as an "inconsistency." *Lizhi Qiu*, 944 F.3d at 845 ("Neither the IJ nor the government asked Petitioner about the *inconsistency* at the merits hearing, so it cannot justify the denial of asylum." (emphasis added)). While the *Lizhi Qiu* petitioner's decision might have been inconsistent with the IJ's assumption about where a student would reside while waiting for her degree, the finding did not identify a conflict between two discrete points in the petitioner's testimony or documentary evidence but rather hinged on an assumption regarding what is plausible.

## B.

"[U]nder the REAL ID Act, IJs must provide specific and cogent reasons in support of an adverse credibility determination." *Shrestha*, 590 F.3d at 1044 (citation and quotation marks omitted). "In assessing the 'totality of the circumstances,' an IJ should discuss which statutory factors, including but not limited to 'demeanor,' 'candor,' 'responsiveness,' 'plausibility,' 'inconsistency,' 'inaccuracy,' and 'falsehood,' form the basis of the adverse credibility determination." *Id.*, *citing* 8 U.S.C. § 1158(b)(1)(B)(iii). Inherent plausibility in the context of adverse credibility determinations refers to the inherent believability of testimony in light of background evidence.

*Jibril*, 423 F.3d at 1135. An implausibility finding based on "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Ai Jun Zhi v. Holder*, 751 F.3d 1088, 1093 (9th Cir. 2014) (alteration in original) (citation omitted). An implausibility finding is based on speculation and conjecture when the witness's testimony is "uncontroverted by any evidence that the IJ can point to in the record." *Jibril*, 423 F.3d at 1135. In addition, an IJ engages in impermissible speculation and conjecture when he or she bases an implausibility finding on an issue that the petitioner was not asked to address during the merits hearing. *Ai Jun Zhi*, 751 F.3d at 1093 (holding that the IJ's suspicions about the petitioner's type of visa were speculation because the IJ "never questioned [the petitioner] on the matter" or sought "an explanation that might have clarified the matter").

The requirement that an implausibility finding be anchored in some record evidence seems to create a tension with our usual approach to ascertaining a statement's believability. Outside of the context of evaluating a witness's testimony in immigration proceedings, we regularly rely just on common sense to determine that a fantastical story is unbelievable. *See, e.g.*, *White v. Ryan*, 895 F.3d 641, 669 (9th Cir. 2018) (dismissing as fantastical a party's claim that he was "tortured by biotelemetry implants"). Even in the context of immigration proceedings, the Board may rely upon its common sense to hold an IJ's factual finding implausible, without citation to the record. *Rodriguez v. Holder*, 683 F.3d 1164, 1170 (9th Cir. 2012) ("The BIA may find an IJ's factual finding to be clearly erroneous if it is illogical or implausible, *or* without support in inferences that may be drawn from the facts in the record." (emphasis added) (citation and quotation marks omitted)).

In *Jibril*, we recognized the constraint that this record evidence requirement places on IJs in making implausibility findings and contemplated the following:

> Although "speculation and conjecture" alone cannot sustain an adverse credibility finding, an IJ must be allowed to exercise common sense in rejecting a petitioner's testimony even if the IJ cannot point to specific, contrary evidence in the record to refute it. Without such latitude, IJs would be bound to credit even the most outlandish testimony as long as it was internally consistent and not contradicted by independent evidence in the record.

423 F.3d at 1135.  While we observed in *Jibril* that IJs should "be allowed to exercise common sense" without citation to "specific, contrary evidence in the record," *id.*, we nonetheless recognized that "under our current practice, we must evaluate the IJ's implausibility findings to determine whether or not they are speculative or conjectural," *id.* at 1136.  In that case, the IJ had found it implausible that the petitioner could have remained unresponsive while being kicked in the head, survived a gunshot wound to the stomach overnight, and found a western aid organization's medical facility in Somalia's capital Mogadishu during a civil war. We held in *Jibril* that the IJ's implausibility findings could "only be characterized as speculative or conjectural" because the IJ failed to point to any evidence in the record that contradicted the petitioner, such as "medical testimony at the hearing to support the IJ's disbelief of [the petitioner's] stoicism and stamina" or any "basis for the conclusion that western aid workers were not active in the city[.] . . ." *Id.* Thus, while *Jibril* contemplated the benefits of allowing IJs

to rely on common sense without citing evidence controverting the testimony to reach an implausibility finding, we ultimately applied the record evidence requirement.

Considering *Jibril* and our other decisions addressing implausibility in the context of credibility determinations, we identify two points with respect to the manner in which IJs may reach an implausibility finding. First, while an IJ must cite contrary evidence in the record, an implausibility finding still hinges on the application of common sense, and this understanding is consistent with the text of the REAL ID Act. In *Jibril*, we stated that "no consistent line . . . has been drawn between an IJ's legitimate application of common sense, on the one hand, and an IJ's reliance on 'speculation or conjecture' in determining that a fact alleged by a petitioner is implausible on the other." 423 F.3d at 1135. While *Jibril* confirmed that an IJ must cite evidence in the record contrary to a witness's testimony to avoid engaging in speculation and conjecture, it recognized the record evidence requirement as a complement to, not a substitute for, an IJ's common sense. Indeed, *Jibril*'s examples of contrary evidence that the IJ could have cited to form the basis of a proper implausibility finding—medical testimony regarding the petitioner's stamina or evidence of a lack of western aid workers in Mogadishu during the relevant time—would not have conclusively proven the petitioner's testimony false but would have required the application of a reasonable assumption based in common sense. *See id.* at 1136. The petitioner's testimony in *Jibril* that he received medical treatment from an aid organization's workers would perhaps not be impossible but would be implausible in light of record evidence that the organization had already evacuated its workers from Mogadishu. Thus, *Jibril* acknowledged that an

implausibility does not necessarily arise from an express conflict between two points in a petitioner's testimonial or documentary evidence but rather hinges on a reasonable assumption based in common sense.

*Jibril* preceded the REAL ID Act, which now expressly authorizes IJs to apply such common sense to reach an implausibility finding. In listing the factors that an IJ can consider in reaching a credibility determination, the REAL ID Act states:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii). The statute identifies "inherent plausibility" of a witness's account as a factor distinct from various types of inconsistencies, including those between a "witness's written and oral statements" and those between a witness's oral and written statements, and "other evidence of record (including the reports of the

Department of State on country conditions)." Construing our record evidence requirement for implausibility findings as demanding an express conflict between a witness's testimony and some other evidence in the record, independent from an application of common sense, would render the REAL ID Act's distinction between implausibility and inconsistencies meaningless. Although canons of statutory interpretation are not mandatory rules, we try to give effect to each word and clause in a statute if possible. *See Chickasaw Nation v. United States*, 534 U.S. 84, 93–94 (2001); *see also United States v. Barraza-Lopez*, 659 F.3d 1216, 1220 (9th Cir. 2011). To give meaning to the inherent plausibility factor and distinguish it from the inconsistency factors, we interpret the REAL ID Act to enable IJs to apply common sense to reach an implausibility finding.

Thus, a witness's testimony can satisfy the record evidence requirement for an implausibility finding. Our decisions upholding implausibility findings often consider the plausibility of a witness's statement in light of background evidence such as country condition reports or news articles. *See, e.g.*, *Singh*, 802 F.3d at 976 (upholding the IJ's finding that the petitioner's account of being attacked by Sikh militants in India was implausible considering an Amnesty International country report indicating that armed Sikh militancy ended years prior). However, contrary evidence that can form the basis of an implausibility finding is not limited to such country reports. *Jibril*, 423 F.3d at 1135 ("[A] finding made by an IJ that a petitioner's testimony is implausible given the evidence in a Country Report *or other objective evidence in the record* is accorded deference." (emphasis added)); *see also id.* at 1136 (suggesting that "medical testimony" could have served as record evidence to support the IJ's implausibility finding).

Oral statements, including a witness's testimony, are clearly also evidence in the record, and the REAL ID Act's definition of evidence in the record encompasses a witness's testimony. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("[A] trier of fact may base a credibility determination on . . . the consistency of such [written or oral] statements with other evidence of record. . . ."). This is consistent with our requirement that the IJ provide an opportunity for a witness to address a potential implausibility. *See Ai Jun Zhi*, 751 F.3d at 1093. Just as a witness's explanation might clarify an issue, *see id.*, his or her failure to provide a persuasive explanation or challenge an assumption can serve as the basis of an implausibility finding. While *Jibril* worried about IJs having to accept "outlandish testimony as long as it was internally consistent," 423 F.3d at 1135, simple follow-up questioning regarding a potentially implausible account can eliminate the risk of such absurd outcomes. In addition, a witness's testimony on direct, cross-examination, or solicited by the IJ's questioning can satisfy any record evidence requirement to support an IJ's implausibility finding.

Thus, when making a credibility determination under the REAL ID Act, an IJ may consider, among other factors, the inherent plausibility of a witness's account. *Shrestha*, 590 F.3d at 1039, *citing* 8 U.S.C. § 1158(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1231(b)(3)(C) (adopting the standard in 8 U.S.C. § 1158(b)(1)(B) for withholding of removal); 1229a(c)(4)(C) (all other relief). An IJ must provide specific and cogent reasons in support of an implausibility finding that forms the basis of an adverse credibility determination. *See Shrestha*, 590 F.3d at 1042. In addition, an IJ must provide a witness an opportunity to explain a perceived implausibility during the merits hearing. *Ai Jun Zhi*, 751 F.3d at 1093. As with "each factor forming the basis of

an adverse credibility determination, the IJ should refer to specific instances in the record that support a conclusion that the factor undermines credibility," *Shrestha*, 590 F.3d at 1044, and an IJ should cite evidence in the record that undermines the plausibility of the witness's testimony, *Jibril*, 423 F.3d at 1135. An IJ must not "cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result." *Shrestha*, 590 F.3d at 1040; *see also Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1040 (9th Cir. 2008) (holding that an IJ's adverse credibility determination was not supported by substantial evidence when the "petitioner offered an explanation" for the purported implausibility that "the IJ did not address"). The cited evidence in the record, including a witness's own testimony, need not conclusively establish that the witness's testimony is false, and the IJ's implausibility finding will ultimately hinge on the application of a reasonable evaluation of the testimony and evidence based on common sense. *See id.* at 1136. Factual findings, including implausibility findings, "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Garcia*, 749 F.3d at 789, *quoting* 8 U.S.C. § 1252(b)(4)(B).

We recognize that an IJ's application of common sense might rest on unreasonable assumptions or be untethered from the evidence in the record. *See Lizhi Qiu*, 944 F.3d at 845; *see also Yan Xia Zhu*, 537 F.3d at 1040 (holding that the IJ's finding that the petitioner would not have been knocked unconscious from a "slap" misstated the characterization of the attack in the transcript). Moreover, what seems like common sense to an IJ might be rooted in significant differences between the IJ's and witness's cultural backgrounds and systems. In *Yan Xia Zhu*, we held that the IJ's implausibility finding was impermissibly based

in speculation and conjecture that a rape victim would necessarily see a doctor, and we faulted the IJ for not addressing the witness's explanation for the perceived implausibility, that she "dare[d] not" go to a doctor. 537 F.3d at 1040 (alteration in original).  Moreover, a concurrence highlighted the greater stigmatization of rape victims in other countries.  *See id.* at 1046 (Gould, J., concurring) ("[R]egrettably, in many parts of the world, a young woman's report of a rape is likely to bring shame and discredit upon her and her family, as much as it is likely to result in any prosecution of the wrongdoer.").  This mix of constraints and flexibility that we have identified enables an IJ to challenge a witness on a perceived implausibility and discredit unbelievable testimony, while guarding against unwarranted assumptions that are untethered from evidence in the record or based not on common sense but rather on cultural differences.

## C.

Having clarified our case law with respect to implausibility findings, we turn to the implausibility findings in this case.  Here, the IJ discussed in detail her specific and cogent reasons for finding implausible Lalayan's testimony.  Substantial evidence supports the IJ's findings that it is implausible that Lalayan would file a complaint with the prosecutor general's office about the Union's embezzlement against UMCOR but not notify UMCOR itself, that he never looked at the Union's distribution lists until he prepared to leave UMCOR, and that he decided to come to the United States only during his last two days in Mexico.  With respect to each of these findings, the government and the IJ questioned Lalayan extensively about his decisions and his various explanations, and he had ample opportunity to address the perceived implausibilities.

The Agency cited numerous points of evidence in the record, including Lalayan's testimony, and applied assumptions based in common sense to make the implausibility findings.

With respect to Lalayan's decision not to notify UMCOR, the IJ was careful not to assume how UMCOR might respond to a report of embezzlement, and the Agency instead cited Lalayan's unpersuasive response to the IJ's question of whether he thought UMCOR would be made aware of the prosecution. Lalayan argues that this was "clearly speculation by the IJ, as there is no evidence to support a finding that a complaint filed with the Prosecutor General's office regarding illicit activities undertaken by the Union would automatically place UMCOR on notice." However, as the government correctly points out, the Agency never suggested that the mere act of filing the complaint would have automatically put UMCOR on notice. Lalayan's understanding of the requisite contrary evidence is overly narrow and confuses an inconsistency with an implausibility. *See supra* Part II.B. Additionally, in light of his statements discussing his reason for filing the complaint and his commitment to ending embezzlement, the Agency found implausible Lalayan's other explanations for his decision not to notify UMCOR—that he was primarily interested in the Union being punished, not about aid reaching Armenians in need, and viewed it as a "personal matter."

With respect to Lalayan's discovery of the Union's embezzlement just before leaving his position at UMCOR, the Agency cited Lalayan's seven years of experience as an UMCOR warehouse officer, his testimony and documentary evidence that his UMCOR responsibilities included inventorying and delivering aid, and, most importantly, Lalayan's testimony on redirect examination that he was

responsible for the warehouse's accounting, reviewed organizations' distribution sheets, and rejected organizations' requests if they contained discrepancies. Lalayan argues that he "likely did not check the distribution lists periodically" and suggests that he reviewed the distribution sheets more thoroughly in October 2015 so he could "leave his post in good standing." The evidence in the record does not support Lalayan's argument, and moreover, we cannot supplant the IJ's reasonable assumption with any alternative explanation offered on appeal.

With respect to Lalayan's decision to travel to the United States, the Agency cited Lalayan's decision-making process after the Petitioners left Armenia, specifically that he determined in Russia that Mexico was not safe for his family, nevertheless decided to travel to Mexico without having a follow-on destination in mind, and only decided to travel to the United States during the Petitioners' two days in Mexico. The Agency reasonably applied common sense to determine that it was not plausible that Petitioners would have decided their travel plans in this manner.

The Agency's ultimate conclusion that Lalayan's account is not plausible must be sustained. The Agency's implausibility findings are supported by evidence in the record and are based on reasonable assumptions, even if other alternative explanations exist. Any reasonable adjudicator would not necessarily be compelled to conclude to the contrary.

## D.

We need not reach the issue of whether the IJ's implausibility finding regarding Yeghiazaryan's involvement in the decision to come to the United States was based on speculation and conjecture. During the merits

hearing, Yeghiazaryan testified that Lalayan did not involve her in the decision-making process to travel to the United States and indicated that Lalayan regularly did not share information with her, referring to "the way he did things." The IJ determined that it was implausible that Yeghiazaryan would not be involved and cited evidence in the record that she has family in the United States and applied with Lalayan for United States visas on November 2, 2015. Lalayan argues that the IJ's implausibility finding is based on a faulty assumption that does not recognize cultural differences between the United States and Armenia with respect to traditional gender and marital roles. Lalayan states that "as a male Armenian head of the household, it is customary for [Lalayan] to be the decision-maker as it would be seen solely as [Lalayan's] responsibility to ensure the safety of his family. Accordingly, it is not incredible for [Yeghiazaryan] to be in the dark about some of the decisions made by [Lalayan]." But the Board did not adopt this implausibility finding in its decision. Because we only review the IJ's decision to the extent that the Board adopts the IJ's reasoning, *Shrestha*, 590 F.3d at 1039, we need not conclusively determine whether the IJ provided Yeghiazaryan an opportunity to address the perceived implausibility and relied upon a reasonable assumption, or engaged in impermissible speculation and conjecture.

## III.

We turn next to the IJ's determination that Yeghiazaryan was not credible because of her evasiveness and non-responsiveness. Substantial evidence supports this determination, regardless of whether it was simply a demeanor finding, or a mixed finding of demeanor, relating to evasiveness, and non-responsiveness.

The IJ based her adverse credibility determination in part on Yeghiazaryan's "vague, evasive, and non-responsive" answers in response to the IJ's repeated questions about when Lalayan decided to decline the job offer in Mexico and whether it was their plan all along to travel to the United States. The Board characterized this finding as the IJ's "demeanor observation" and deferred "given the Immigration Judge's unique position of witnessing the testimony of [Yeghiazaryan] during the hearing." Although the Petitioners do not challenge this finding on appeal, we consider it as an element in the totality of circumstances that supported the IJ's credibility determination. "[T]o support an adverse credibility determination based on unresponsiveness, the BIA must identify particular instances in the record where the petitioner refused to answer questions asked of him." *Shrestha*, 590 F.3d at 1042 (citation omitted). "An IJ should give fair notice of inconsistencies in testimony or points on which the IJ thinks the witness is not being responsive." *Garcia*, 749 F.3d at 790. We have characterized an IJ's determination that a witness was non-responsive and evasive as a type of demeanor finding, *see Bingxu Jin v. Holder*, 748 F.3d 959, 965 (9th Cir. 2014); however, the "special deference" we accord to an IJ's demeanor findings only applies to "non-verbal, and therefore non-textual, factors." *Jibril*, 423 F.3d at 1137; *see also Manes v. Sessions*, 875 F.3d 1261, 1263 (9th Cir. 2017) ("These are specific, first-hand observations—precisely the kind of credibility cues that are the special province of the factfinder.").

We recognize that the REAL ID Act differentiates between the demeanor and responsiveness of a witness. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). ("[A] trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness[.] . . .").

However, it is immaterial whether the Board correctly characterized the IJ's determination that Yeghiazaryan provided "vague, evasive, and non-responsive" answers as only a demeanor finding, or if it constituted a mixed finding of both demeanor and non-responsiveness. Our special deference to certain types of demeanor findings is not relevant here because the IJ's determination was based on verbal factors, and Yeghiazaryan's evasiveness and non-responsiveness are clear from the text of the hearing transcript. The Agency provided numerous instances of Yeghiazaryan's evasiveness and non-responsiveness when answering the IJ's questions regarding the timing of the decision to travel to the United States. The IJ's repeated, seriatim questions regarding the couple's decision as well as the IJ's statement to Yeghiazaryan, "You didn't answer my question," provided Yeghiazaryan fair notice of the IJ's observation of evasiveness and non-responsiveness. Substantial evidence supports the Agency's adverse credibility determination regarding Yeghiazaryan.

## IV.

We review for substantial evidence the Board's determination that Lalayan is not eligible for withholding of removal. *Shrestha*, 590 F.3d at 1039. "To qualify for withholding of removal, a petitioner must establish a clear probability that his life or freedom would be threatened if he returned to his homeland on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (citation and quotation marks omitted). "Eligibility for withholding of removal can be established by demonstrating past persecution or by 'demonstrat[ing] . . . a subjective fear of persecution in the future . . . that . . . is objectively reasonable[.]'" *Id.* (first alteration and ellipses in original) (citation omitted), *quoting*

*Wakkary v. Holder*, 558 F.3d 1049, 1060 (9th Cir. 2009). As substantial evidence supports the Agency's adverse credibility determination, Lalayan has failed to establish past persecution. He has also failed to establish a well-founded fear of future persecution. First, it is not clear that Lalayan holds the political opinion regarding corruption that he claims he would be persecuted for if removed to Armenia. Moreover, while the country reports and news articles submitted by Lalayan indicate that political corruption and human rights abuses exist in Armenia, they in no way establish that Lalayan would "more likely than not" be persecuted upon removal to Armenia on account of his stated political opinion. *See Tamang v. Holder*, 598 F.3d 1083, 1091 (9th Cir. 2010), *quoting INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987). Substantial evidence supports the Board's holding that the IJ properly denied Lalayan's withholding of removal claim.

## V.

"We review for substantial evidence the BIA's determination that [Lalayan] is not eligible for protection under CAT." *Id.* at 1048. "To receive CAT protection, a petitioner must prove that it is 'more likely than not' that he or she would be tortured if removed." *Id.*, *quoting* 8 C.F.R. § 1208.16(c)(2). "In addition, the petitioner must demonstrate that he would be subject to a *particularized threat of torture*, and that such torture would be inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Dhital v. Mukasey*, 532 F.3d 1044, 1051 (9th Cir. 2008) (citation and quotation marks omitted). "An adverse credibility determination does not, by itself, necessarily defeat a CAT claim because CAT claims are analytically separate from claims for withholding of removal." *Garcia*,

749 F.3d at 791 (citation and quotation marks omitted). "But when the petitioner's 'testimony [is] found not credible, to reverse the BIA's decision [denying CAT protection,] we would have to find that the reports alone compelled the conclusion that [the petitioner] is more likely than not to be tortured.'" *Shrestha*, 590 F.3d at 1048–49 (alterations in original), *quoting Almaghzar v. Gonzales*, 457 F.3d 915, 922–23 (9th Cir. 2006). We agree with the Agency that the country reports submitted do not indicate any particularized risk of torture if Lalayan were removed to Armenia. Substantial evidence supports the Board's holding that the IJ properly denied Lalayan CAT relief.

## VI.

Substantial evidence supports the Agency's implausibility findings with respect to Lalayan's testimony and its finding that Yeghiazaryan was evasive and non-responsive. We do not consider the Board's alternative holding that assumed that Lalayan was credible. The record does not compel the conclusion that the adverse credibility determination was erroneous or that the Agency erred in denying Lalayan's applications for asylum, withholding of removal, and CAT relief.

The petition for review is **DENIED.**