**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ERNESTO ABRONCIO UC ENCARNACION, | No. 22-1601 |
| | Agency No. A200-824-135 |
| *Petitioner*, | |
| v. | OPINION |
| PAMELA BONDI, Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 11, 2025
Pasadena, California

Filed September 30, 2025

Before: Susan P. Graber, David F. Hamilton,* and Patrick
J. Bumatay, Circuit Judges.

Opinion by Judge Hamilton;
Dissent by Judge Bumatay

---

* The Honorable David F. Hamilton, United States Circuit Judge for the
U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

# SUMMARY[**]

## Immigration

The panel denied in part and granted in part Ernesto Abroncio Uc Encarnacion's petition for review of a Board of Immigration Appeals' decision, holding that dismissal of the petition for review was not warranted under the fugitive disentitlement doctrine and that substantial evidence supported the denial of withholding of removal, but remanding Petitioner's claim for relief under the Convention Against Torture for further consideration.

Less than a week before oral argument, the government moved to dismiss this petition under the fugitive disentitlement doctrine, which allows an appellate court to exercise its discretion to dismiss the appeal of an appellant who is a fugitive from justice. The government argued that Petitioner became a fugitive when he failed to attend a 2022 custody redetermination appointment. In declining to dismiss the petition, the panel explained that the government's invocation of the doctrine came too late and that, while Petitioner's failure to attend his 2022 appointment placed him in legal default, that alone did not disentitle him from his appeal. Further, Petitioner is almost certainly not a fugitive or in hiding, and his potentially meritorious claim for CAT relief reinforced the conclusion that disentitlement was unwarranted.

As to relief from removal, Petitioner asserted that his indigenous heritage, gang-related tattoos, multiple

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

deportations, mental illnesses, and substance-abuse disorder put him at high risk of persecution and torture, either by the Mexican police or by criminal organizations with governmental acquiescence.

The panel denied the petition with respect to Petitioner's claim for withholding of removal because substantial evidence supported the agency's dispositive adverse credibility determination. The panel explained that substantial evidence supported two of the agency's reasons for the credibility determination: the implausibility of Petitioner's claim that he is not a gang member, as well as Petitioner's demeanor during testimony. As to the third reason—the omission from his original application that he had experienced rectal bleeding since an attack in Mexico—the panel concluded that this omission did not support the adverse credibility determination. However, considering the totality of the circumstances, the panel concluded that substantial evidence did support the adverse credibility determination.

As to CAT relief, the panel concluded that the Board failed to give reasoned consideration to substantial expert testimony and country-conditions evidence of extreme violence against individuals in Mexico on the basis of perceived gang affiliation, deportee status, indigenous heritage, mental illness, and substance abuse. Had the Board afforded this evidence any weight, it could have concluded that Petitioner's combination of risk factors would give him a greater than fifty percent likelihood of being individually and intentionally singled out by criminal organizations or Mexican law enforcement for harsh treatment amounting to torture. Instead, the Board dismissed the country-conditions evidence in a single sentence. The panel therefore remanded

Petitioner's CAT claim for further consideration in light of all the relevant record evidence.

Dissenting, Judge Bumatay wrote that Uc Encarnacion became a fugitive when, almost immediately after filing this petition for review, he failed to appear at a mandatory immigration custody hearing. Instead, he absconded, remains at large, and appears to be continuing to break the law. Judge Bumatay concluded that Uc Encarnacion plainly qualifies as a fugitive under the fugitive disentitled doctrine, writing that evading immigration custody is the very definition of being a fugitive and that failure to appear at an immigration hearing itself is enough to trigger the doctrine. Further, Judge Bumatay wrote that the rationales animating the doctrine—the equitable imperative of preserving the dignity of the courts, together with the pragmatic concerns of enforceability, deterrence, and the efficient operation of the appellate process—warranted its application here.

## COUNSEL

Yan Zhao (argued), Daniel R. Adler, Geronimo Morales, Ali Johnson, and Kahn A. Scolnick, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Petitioner.

Andrew B. Insenga (argued), Trial Attorney; Matthew B. George, Senior Litigation Counsel; Office of Immigration Litigation; Brian Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

HAMILTON, Circuit Judge:

Ernesto Abroncio Uc Encarnacion, a citizen of Mexico, petitions for review of a Board of Immigration Appeals' decision affirming an immigration judge's (IJ) decision to deny withholding of removal and relief under the Convention Against Torture (CAT). Petitioner asserts that his indigenous heritage, gang-related tattoos, multiple deportations, mental illnesses, and substance-abuse disorder put him at high risk of persecution and torture, either by the Mexican police or by criminal organizations with governmental acquiescence. In support of his application for relief from removal, he testified that he had been attacked in Mexico on three occasions, once by Mexican law enforcement, once by a vigilante group, and once by gang or cartel members. He also submitted the testimony of two country-conditions experts and about a thousand pages of documentary evidence describing widespread human rights abuses in Mexico affecting people like Petitioner.

We deny the petition with respect to Petitioner's claim for withholding of removal because substantial evidence supports the agency's dispositive adverse credibility determination about his testimony. We also conclude, however, that the Board did not give reasoned consideration to substantial expert testimony and documentary evidence about Petitioner's likelihood of being tortured in Mexico. We therefore remand Petitioner's CAT claim to the agency for further consideration in light of all the relevant evidence in the record. See *Eneh v. Holder*, 601 F.3d 943, 948–49 (9th Cir. 2010) (remanding because the Board failed to "give

reasoned consideration to [the petitioner's] potentially dispositive testimony and documentary evidence").

## I.  *Factual Background*

The following facts are taken from Petitioner's application for relief from removal and his testimony before the IJ.  We recount the facts as Petitioner presented them without regard to whether the agency ultimately found them credible, but we will circle back below to the credibility problems.

Petitioner is an indigenous Mexican of Mayan descent. Born and initially raised in Yucatán, Mexico, Petitioner joined his father in the United States in San Francisco when he was nine years old.  In San Francisco, his childhood was tumultuous—he was physically and verbally abused by his alcoholic father, who eventually kicked him out of the family home.  When Petitioner was about sixteen, his mother intervened and sent him back to Yucatán, to protect him from his father's abuse.

In Yucatán, Petitioner lived in the same neighborhood as his paternal uncles, who are leaders of a local gang affiliated with the Sureños-13 gang.  In his written statement supporting his application for relief, Petitioner asserted that his uncles gave him several tattoos associated with the Sureños on his chest and left forearm and below his left eye and that they did so to protect him from other Sureños members.  He also claims that he was never involved in any criminal activity.

Petitioner returned to San Francisco at age eighteen.  In 2011, after spending three years in jail for charges that were ultimately dismissed, he was removed to Mexico.  He claims that after he returned to Mexico, his life was threatened by

three different groups of people: (1) police officers; (2) a vigilante group; and (3) gang or cartel members.

## A. *First attack: police officers*

When Petitioner returned to Mexico, he moved to Yotholin, Yucatán, to live with the family of his then-girlfriend, the mother of his child. He claims that his visible tattoos, style of dress, and recent deportation attracted attention from the police. At some point during 2011, police officers stopped him on the road and began asking him about his tattoos and his knowledge of drug sales. They handcuffed him, placed a hood over his head, and took him to an unknown location. After stripping him naked, Petitioner said, the officers beat him with the butts of their guns. They also hung him by his feet and repeatedly dunked his hooded head into a barrel of water.

The beating lasted for about an hour and a half. It caused several injuries, including a broken nose, a broken foot, rectal bleeding, and chronic rib pain. The police released Petitioner after fining him 2,000 pesos.

## B. *Second attack: vigilante group*

After living in Yotholin for a while, Petitioner began to have problems with a vigilante group composed of other indigenous men. On several occasions, they threatened to beat or shoot him if he did not leave their neighborhood. According to Petitioner, the men in the group disliked him because of his tattoos and his family's affiliation with the Sureños.

One night in 2011, a group of more than thirty vigilantes armed with machetes and other weapons surrounded the house where Petitioner was living with his girlfriend's family. The group broke the window of the bedroom where

Petitioner's son slept, and Petitioner ran outside with a machete. The group threatened to lynch Petitioner, and one of the vigilantes threw a machete at him. The machete narrowly missed him, but it struck his son in the stomach. His girlfriend's mother eventually persuaded the vigilante group to disperse. After his girlfriend reported the attack, local police told Petitioner that he was a problem in the village and that either he or one of the vigilantes was going to end up killed or in jail. His girlfriend's family cut ties with Petitioner, fearing further violence if he continued to live with them.

### C. *Third attack: cartel or gang members in Quintana Roo*

After the incident with the vigilante mob, Petitioner moved to Merida, another town in Yucatán, where he worked on road construction for about a year and a half. While Petitioner was there, he learned that drug cartels had decapitated twelve deportees in Yucatán. He asserts that two of the men were deportees from the United States whom he had known in San Francisco. Fearing for his life, Petitioner relocated in 2012 to the state of Quintana Roo to live with one of his uncles.

In 2016, after about four uneventful years working for his uncle's ranching business, Petitioner was shot in the foot by masked gang or cartel members. The masked assailants took him to the hospital after realizing that they had intended to shoot someone else. After the shooting, Petitioner's uncle forced him to leave because he suspected that Petitioner was involved in gang activity.

Again, the accounts of the attacks we have just summarized are Petitioner's accounts, and the agency found he was not credible.

### D. *Return to the United States*

After the shooting in Quintana Roo, Petitioner returned to Yotholin for about five months to spend time with his girlfriend and their son. He says he continued to receive death threats from people in the community until he returned to San Francisco in 2016. After returning to the United States, Petitioner supported himself by working as a dishwasher, food preparer, and janitor. During this period, he began having nightmares about the Mexican police and gang violence. He became paranoid, began using methamphetamine, and experienced auditory and visual hallucinations. He has since been diagnosed with post-traumatic stress disorder (PTSD), major depressive disorder, and substance-abuse disorder.

## II. *Procedural Background*

In 2020, the Department of Homeland Security (DHS) reinstated Petitioner's 2011 removal order. After expressing fear of returning to Mexico, Petitioner was placed in proceedings to pursue withholding of removal and relief under the Convention Against Torture. He applied for withholding of removal and CAT relief in May 2020.

In his application, Petitioner relied on the three incidents involving the Mexican police, the vigilante group, and the gang or cartel members in Quintana Roo to support his claims for withholding of removal and CAT relief. He submitted statements written by (1) himself about the mistreatment he experienced in Mexico; (2) his mother and his sister about instances of gang violence against their family; (3) his U.S. citizen partner about his efforts to support himself and to overcome his mental illnesses and substance-abuse disorder; (4) his clinical psychologist about the symptoms and effects of his PTSD, depression, anxiety,

and substance abuse; and (5) country-conditions experts, Dr. Jeremy Slack and Dr. Howard Campbell, about the likelihood that he would be tortured or killed if he were returned to Mexico. Petitioner also submitted nearly a thousand pages of country-conditions evidence about the extrajudicial torture and killing of people situated similarly to himself in Mexico.

In June 2020, Petitioner and his two country-conditions experts testified at a hearing before an IJ. Over the course of the eight-hour hearing, there were numerous antagonistic exchanges between the IJ and Petitioner's prior counsel. Petitioner and the government agree before this court that the IJ was frustrated by counsel's conduct, but they dispute whether the IJ's frustration was justified and to what extent it affected the hearing process. Our review of the transcript shows repeated provocative, obstructive, and unprofessional actions by Petitioner's then-counsel, who has not appeared in this petition for judicial review.

After the hearing, the IJ issued an oral ruling, denying both withholding of removal and CAT relief on several grounds. The IJ found that Petitioner was not a credible witness based on his denial of gang membership, his demeanor, and his omission of a sensitive injury (rectal bleeding) from his application. The IJ also denied CAT relief on the additional ground that Petitioner's country-conditions evidence did not independently establish that he would likely be tortured if returned to Mexico. The Board affirmed the IJ's factual findings and held that Petitioner's

country-conditions evidence did not independently establish his eligibility for CAT relief.[1]

In September 2022, Petitioner filed a petition for review of the agency's denial of relief.  Before discussing the merits of Petitioner's claims for withholding of removal and CAT relief, we first address the government's eleventh-hour motion to dismiss this petition for judicial review.

III.    *The Late Motion to Dismiss*

Less than a week before oral argument, the government filed a motion asking us to exercise our discretion under the fugitive disentitlement doctrine to dismiss Uc Encarnacion's petition.[2]    Under that doctrine, an appellate court may exercise its discretion to "dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993); *see United States v. Terabelian*, 105 F.4th 1207, 1214 (9th Cir. 2024) (noting that the fugitive disentitlement doctrine is discretionary and grounded in equity).  Although the "paradigmatic object of the doctrine is the convicted criminal who flees while his appeal is pending," we have

---

[1] Regarding withholding of removal only, the IJ concluded that Petitioner's claimed protected grounds were either not cognizable or unrelated to his past persecution.  The Board declined to reach those issues, and they do not affect our resolution of this petition.  The Board also rejected Petitioner's claim that the IJ violated his due process rights and denied as moot his motion to remand based on new legal authority. In this court, Petitioner does not challenge those aspects of the Board's decision.

[2] At no point has the government asked us to dismiss the petition for review as untimely and, because the timeliness of the petition for review is not a jurisdictional requirement, *Riley v. Bondi*, 606 U.S. —, —, 145 S. Ct. 2190, 2201–04 (2025), we do not reach the issue.

also applied the doctrine in immigration cases. *Antonio-Martinez v. I.N.S.*, 317 F.3d 1089, 1092 (9th Cir. 2003).

Petitioner has never been in, or escaped from, the custody of DHS during the pendency of this petition. Nonetheless, the government argues that Petitioner became a fugitive from justice when he failed to attend a custody redetermination appointment with DHS scheduled for October 3, 2022, a week after he filed this petition. Despite having known about Petitioner's failure to attend the October 2022 appointment for more than two years, the government waited until the Friday before oral argument to bring this missed appointment to our attention. The government did not provide any evidence that Petitioner is currently a fugitive from justice. On the contrary, it revealed that it had learned Petitioner's whereabouts from DHS.

On these facts, we will not dismiss this petition. As an initial matter, the government's invocation of the fugitive disentitlement doctrine came too late. The motion was not based on new information; it was filed long after the missed meeting and well after both parties had already fully briefed the case on the merits. Dismissing Petitioner's appeal on fugitive disentitlement grounds now would be "inconsistent with our longstanding rule that we do not consider arguments not raised in the briefs." *Seven Words LLC v. Network Sols.*, 260 F.3d 1089, 1097 (9th Cir. 2001); *see United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007) (explaining that, where appellees fail to raise an argument in their answering brief, "they have waived it").

Further, although Petitioner's failure to attend his 2022 appointment with DHS placed him in default of his legal obligations, that "does not alone disentitle [him] from making this appeal." *Mamigonian v. Biggs*, 710 F.3d 936,

940 (9th Cir. 2013), *abrogated on other grounds by Patel v. Garland*, 596 U.S. 328 (2022).  We have declined to apply the fugitive disentitlement doctrine to "an alien whose whereabouts are known and who has not fled from custody." *Wenqin Sun v. Mukasey*, 555 F.3d 802, 804 (9th Cir. 2009); *see id.* at 804–05 (declining to dismiss petition of alien who did not report for removal because her whereabouts were known to her counsel, DHS, and this court).  In *Mamigonian*, for example, we declined to dismiss an alien's petition for review based on her failure to surrender for her deportation flight.  710 F.3d at 940.  Although the government did not know the petitioner's whereabouts when the parties originally briefed the case, it began electronic monitoring of her while the petition was pending.  *Id.* at 941.  Because her whereabouts were known and there was no indication that she was in hiding, we declined to dismiss her petition on fugitive disentitlement grounds.

Like the petitioner in *Mamigonian*, Uc Encarnacion is almost certainly not a fugitive or in hiding; his whereabouts are likely known to his counsel, DHS, and the court.[3]  Cf.

---

[3] In its motion to dismiss filed a week before oral argument, the government reported that the Department of Homeland Security had informed the Department of Justice that, "in September 2024, a person named 'Ernesto Uc Encarnacion,' aged 35—which aligns with his birthdate …—was arrested and charged with multiple weapons and assault crimes in San Francisco," citing https://sfsheriff.com/find-person-jail, which the government had last visited February 6, 2025.  A more recent check of that same website on September 22, 2025, indicated that he is still in the San Francisco Jail with no release date set after more than a year in jail.  The government's motion to dismiss told us that it cannot verify that the person with this uncommon name and the correct age is the Petitioner, but DHS clearly thought so, and we too consider it exceedingly likely.  Nor does our checking the continuing validity of the

*Antonio–Martinez*, 317 F.3d at 1091–93 (applying fugitive disentitlement doctrine where alien had lost contact with counsel and the agency and all efforts to contact him had failed for over two years).  There are no aggravating facts in this case that shift the balance of equitable considerations present in *Mamigonian* in the government's favor.  On the contrary, Petitioner's case presents an additional equitable consideration weighing against dismissal that was not present in *Mamigonian*: the prospect that he may be eligible for CAT relief.

As we explain below, Petitioner has a strong case that there is a greater than 50 percent chance that he will be tortured if he is removed to Mexico.  In a case involving the potential loss of property rather than life, the Supreme Court cautioned that "disentitlement is too blunt an instrument for advancing" a court's substantial interests in preserving its dignity and deterring flight from prosecution.  *Degen v. United States*, 517 U.S. 820, 828 (1996); *see id.* at 828–29 (reversing grant of summary judgment on fugitive disentitlement grounds in civil forfeiture case).  The Court's call for restraint has even more force where the potential consequences of dismissal include torture and death.  While the mere presence of a CAT claim, even a meritorious one, does not compel us to decide a pending petition on the merits, it is a significant equitable consideration weighing against dismissal.  Petitioner's potentially meritorious CAT claim reinforces our conclusion that disentitlement is unwarranted.[4]

---

information listed on a website *that the government cited to us* constitute impermissible "online sleuthing." *See* Dissent at 47.

[4] We appreciate our dissenting colleague's thoughtful contrary perspective.  But, for the reasons stated in text, we weigh the equitable

## IV. *Merits*

### A. *Standard of Review*

Petitioner argues that his testimony, his country-conditions evidence, or a combination of the two establishes his eligibility for withholding of removal and CAT relief. We review denials of withholding of removal and CAT relief for substantial evidence. 8 U.S.C. § 1252(b)(4)(B); *Silva-Pereira v. Lynch*, 827 F.3d 1176, 1184 (9th Cir. 2016). Under this deferential standard, "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Dong v. Garland*, 50 F.4th 1291, 1296 (9th Cir. 2022) (quoting *Iman v. Barr*, 972 F.3d 1058, 1064 (9th Cir. 2020)) (internal quotation marks omitted).

Because the Board issued its own decision that adopted parts of the IJ's reasoning, we review both decisions. *Iman*, 972 F.3d at 1064. We examine "the reasons explicitly identified by the BIA" and "the reasoning articulated in the IJ's oral decision in support of those reasons." *Lai v. Holder*, 773 F.3d 966, 970 (9th Cir. 2014) (quoting *Tekle v. Mukasey*, 533 F.3d 1044, 1051 (9th Cir. 2008)). We do not review those parts of the IJ's decision that "the BIA did not identify as 'most significant' and did not otherwise mention." *Id.*[5]

---

considerations differently and, in the exercise of our discretion, decline to dismiss the petition. See *Terabelian*, 105 F.4th at 1214 (holding that discretionary dismissal under this doctrine is a "severe sanction that we do not lightly impose" (citation and internal quotation marks omitted)). The nature of this equitable, discretionary, and case-specific doctrine means that panels reasonably may reach different conclusions when confronted with similar factual scenarios.

[5] In its brief, the government relied on some reasons that were not cited by the Board. In doing so, it ran afoul of the well-established rule that

## B. *Adverse Credibility Determination*

We begin on the merits with Petitioner's challenge to the IJ's adverse credibility finding, which the Board affirmed. Petitioner's application is subject to the credibility standards in the REAL ID Act. *Iman*, 972 F.3d at 1064. That Act directs an IJ to base an adverse credibility determination on "all relevant factors" in light of "the totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii). The relevant factors include, but are not limited to, an applicant's "demeanor, candor, or responsiveness"; the "inherent plausibility" of the applicant's account; and the consistency of the applicant's statements with other evidence of record. *Id.*

The Board cited three reasons for affirming the IJ's adverse credibility determination: (1) the implausibility of Petitioner's claim that he is not a gang member; (2) Petitioner's demeanor; and (3) Petitioner's omission of a sensitive injury from his initial application. We address each reason in turn.

### 1. *Gang membership*

Throughout the hearing, Petitioner flatly denied that he had ever been associated with any gang, including the Sureños. The Board found no clear error in the IJ's finding that Petitioner's denial of gang membership was implausible in light of his gang-related tattoos and other record evidence.

By identifying the "inherent plausibility" of a witness's account as a factor distinct from various types of inconsistencies, the REAL ID Act "expressly authorizes IJs

---

"we may consider only the grounds relied upon by" the Board. *Garcia v. Wilkinson*, 988 F.3d 1136, 1143 (9th Cir. 2021). Our analysis is properly limited to those grounds given by the Board.

to apply . . . common sense to reach an implausibility finding." *Lalayan v. Garland*, 4 F.4th 822, 835 (9th Cir. 2021). Credibility findings are not beyond judicial review, however, for "speculation and conjecture" alone cannot support an implausibility finding. *Id.* at 833–34; *see also, e.g.*, *Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1039–40 & n.3 (9th Cir. 2008) (rejecting implausibility finding based on speculation that a rape victim would necessarily see a doctor). The IJ must provide "specific and cogent reasons in support of an implausibility finding," and those reasons must be supported by record evidence that undermines the plausibility of the witness's testimony. *Lalayan*, 4 F.4th at 836.

The IJ adequately supported his implausibility finding. He applied a reasonable assumption that a person with multiple gang-related tattoos is or has been affiliated with a gang. He also cited portions of Petitioner's testimony that, in his view, undermined his denial of gang membership. Specifically, Petitioner testified that his entire family is affiliated with the Sureños. He also testified that the vigilante mob in Yotholin and cartel/gang members in Quintana Roo mistook him for a gang member. Petitioner further testified that his uncle in Quintana Roo came to believe that he was affiliated with a gang and involved in gang activity. The IJ reasonably interpreted this evidence of Petitioner's proximity to gang members and the impression of Petitioner's neighbors and family in Mexico as undermining his denial of gang membership.

Our case law requires IJs to give witnesses an opportunity to address a perceived implausibility. *Lalayan*, 4 F.4th at 836. The IJ complied with that requirement by expressing his skepticism of Petitioner's denial of gang membership and giving him another chance to explain why

he had gang-related tattoos.  Petitioner replied that he had been tattooed only so that he could be recognized in the neighborhood where he lived with his gang-affiliated uncles. In light of the expert testimony in the record about the prevalence of gang-related violence in Mexico, Petitioner's benign explanation for the tattoos was not unreasonable or implausible, at least as a matter of law.  Nonetheless, the IJ was not required to accept Petitioner's explanation given the strength of other evidence in the record and his demeanor during his testimony about his gang-related tattoos.

For example, during one exchange, the IJ asked Petitioner whether he was "ever a member of the Sureños gang."  Although the IJ asked a simple, yes-or-no question about a subject on which Petitioner had already testified, Petitioner paused for five seconds before answering, "No." The IJ noted that five-second pause for the record, and he later explained that he interpreted that pause as Petitioner recognizing the implausibility of his denial.  Because we lack the benefit of having observed Petitioner testify, we defer to the IJ's observation.  *See Dong*, 50 F.4th at 1297–98 (noting that an IJ's observation that the petitioner took a "somewhat long pause" before explaining why he omitted an interrogation from his initial application supported an adverse credibility determination (internal quotation marks omitted)).

In sum, the IJ's and Board's conclusion that Petitioner failed to defend persuasively his denial of gang membership is "supported by evidence in the record and . . . based on reasonable assumptions." *Lalayan*, 4 F.4th at 838.  Although there are other reasonable explanations for Petitioner's denial of gang membership, the record did not compel the IJ or the Board to accept them.

## 2. *Demeanor*

The Board also credited the IJ's assessment that Petitioner "exhibited strong indicia of fabrication during the course of his testimony." We give "special deference" to credibility determinations based on observations about a witness's non-verbal behavior. *Jibril v. Gonzales*, 423 F.3d 1129, 1137 (9th Cir. 2005) (quoting *Singh-Kaur v. I.N.S.*, 183 F.3d 1147, 1151 (9th Cir. 1999)) (internal quotation marks omitted). That special deference extends to observations about "the expression of [a witness's] countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication . . . ." *Shrestha v. Holder*, 590 F.3d 1034, 1042 (9th Cir. 2010) (quoting *Mendoza Manimbao v. Ashcroft*, 392 F.3d 655, 662 (9th Cir. 2003)). "Few, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings . . . ." *Jibril*, 423 F.3d at 1137. Still, an IJ must identify specific examples in the record rather than state unexplained conclusions. *Dong*, 50 F.4th at 1298.[6]

---

[6] Consistent with the American judicial system's reliance on demeanor to assess witness credibility, the REAL ID Act identifies "demeanor" as one of the factors on which an IJ may rely to support an adverse credibility finding. 8 U.S.C. § 1158(b)(1)(B)(iii). However, a substantial body of empirical evidence casts doubt on the reliability of credibility decisions based solely on demeanor. See 12 Wright & Miller's Federal Practice & Procedure § 3070.2 n.24 (3d ed. 2025) (collecting studies); *Morales v. Artuz*, 281 F.3d 55, 61 n.3 (2d Cir. 2002) (same). The potential pitfalls of relying on demeanor are heightened in immigration proceedings, where language barriers, cultural and educational differences, and testimony about traumatic experiences are the norm. *See, e.g.*, *Arulampalam v. Ashcroft*, 353 F.3d 679, 686–87 (9th Cir. 2003) (concluding that the IJ's demeanor finding was not supported

The IJ observed that Petitioner "spoke in hesitating fashion, often pausing during the middle of his testimony to the point where the interpreter would begin interpreting that which he had said and then he would re-begin his statements." Although the transcript does not reflect those pauses, it corroborates the IJ's observation. It shows that the interpreter had to tell Petitioner to wait for her to finish speaking before restarting his answers. The IJ also gave the specific example of the five-second delay discussed above. We regularly credit demeanor findings based on hesitation and lengthy pauses during key questioning. *E.g.*, *Kalulu v. Bondi*, 128 F.4th 1009, 1017 (9th Cir. 2025) (upholding adverse credibility determination based in part on petitioner's long pause before answering one of the IJ's questions); *Dong*, 50 F.4th at 1298; *Ling Huang v. Holder*, 744 F.3d 1149, 1154 (9th Cir. 2014) (crediting IJ's observation that petitioner "hesitated frequently" where transcript documented "a pattern of long pauses after certain questions, followed by an explanation or excuse").

The IJ also observed that Petitioner's facial expressions and body language were agitated. He specified that Petitioner often rocked back and forth and side to side. In light of the IJ's experience observing witnesses in Petitioner's position, we defer to his ability to differentiate between ordinary nerves in a high-stakes hearing and conduct indicating deception. *See Singh-Kaur*, 183 F.3d at

---

by substantial evidence where IJ's appraisal of petitioner's manner of speech bespoke "an insensitivity to petitioner's cultural and educational background") (citing Ilene Durst, *Lost in Translation: Why Due Process Demands Deference to the Refugee's Narrative*, 53 Rutgers L. Rev. 127, 128 (2000) (arguing that credibility determinations in immigration proceedings can often be explained by "barriers created by the inherent otherness of trauma, culture, and language")).

1151 (deferring to IJ's ability to differentiate between "the usual level of anxiety" and the petitioner's behavior—for example, "literally jump[ing] around in his seat" (alteration in original) (internal quotation marks omitted)). Although the IJ's perception of Petitioner's demeanor was subjective, it is still entitled to "special deference." *See Kumar v. Garland*, 18 F.4th 1148, 1155 (9th Cir. 2021) (noting that the IJ's perception that petitioner had a suspiciously "flat affect" was subjective but still entitled to special deference) (quoting *Singh-Kaur*, 183 F.3d at 1151).

Petitioner raises a number of alternative explanations for his demeanor, only one of which merits further discussion. Petitioner contends that we should not defer to the IJ's demeanor observations because the IJ berated him and his counsel and displayed a predisposition to discredit his testimony. He cites cases in which we declined to credit the demeanor findings of IJs who "bullied petitioners during their removal hearings with pervasive 'haranguing,' 'derisive innuendos,' and 'inexplicable outbursts.'" *Kalulu*, 128 F.4th at 1015 (discussing *Garrovillas v. I.N.S.*, 156 F.3d 1010 (9th Cir. 1998), and *Arulampalam*, 353 F.3d 679).

The hearing before the IJ was indeed contentious and even, at times, antagonistic. But, unlike in *Garrovillas* and *Arulampalam*, the IJ's ire appears to have been directed toward Petitioner's prior counsel, not toward Petitioner himself. The IJ's expressions of frustration were directed at prior counsel's frequent repetition of objections after being overruled, interjections of legal argument and commentary about the testimony and collateral matters during questioning, communications with Petitioner in Spanish, and debates with the IJ about his rulings on objections. Many of her interjections seemed designed to interfere with the IJ's questioning of Petitioner about facts that would have been

unfavorable to his claim.  To our eye, many of these tactics at least bordered on contemptuous, though the IJ did not use that term on the record.  In the face of these provocations, the IJ's expressions of frustration toward Petitioner's prior counsel do not reveal bias against Petitioner.  They do not undercut our confidence that he fairly assessed the credibility of Petitioner's testimony.

### 3.  *Omission of sensitive injury*

Although the record supports the Board's first two reasons for affirming the IJ's adverse credibility finding, the same cannot be said about its reliance on Petitioner's testimony that the police beating caused rectal bleeding from which he still suffered nine years later.  Petitioner acknowledged during the hearing that he had not reported rectal bleeding in his written application.  He explained that he had kept the injury to himself because he was embarrassed and ashamed.  Nonetheless, the IJ concluded that Petitioner had fabricated that particularly sensitive injury to embellish his allegations of past torture and to evoke sympathy, and the Board credited that conclusion.

Omissions are a factor on which the Board may rely to make an adverse credibility determination.  8 U.S.C. § 1158(b)(1)(B)(iii).  However, "not all omissions will deserve the same weight or support an adverse credibility finding."  *Iman*, 972 F.3d at 1067.  In general, "omissions are less probative of credibility than inconsistencies created by direct contradictions in evidence and testimony."  *Id.* (quoting *Lai*, 773 F.3d at 971) (internal quotation marks omitted).  The mere omission of details from an initial application for relief from removal generally is insufficient to uphold an adverse credibility finding.  *Id.*

When considering additional details provided for the first time at a hearing, the "principal danger" that we look for is "last-minute attempts to use new allegations to artificially enhance claims of persecution." *Id.* at 1068. Omitted injury allegations can fall on both sides of that line. They may involve inconsequential details, the omission of which lacks probative value, or they may show belated attempts to exaggerate the severity of past harm. *Compare Singh v. Ashcroft*, 301 F.3d 1109, 1112 (9th Cir. 2002) (fact that doctor's letter did not include one of several injuries to which petitioner testified did not support adverse credibility finding), *with Ruiz-Colmenares v. Garland*, 25 F.4th 742, 750 (9th Cir. 2022) (fact that petitioner testified to more severe injury undisclosed in his initial application supported adverse credibility finding).

With those considerations in mind, the IJ's reliance on Petitioner's omission of rectal bleeding from his initial application was not supported by substantial evidence. The IJ believed Petitioner to be lying about the rectal bleeding because he testified that none of the police officers had penetrated his backside during the beating. The IJ did not point to any record evidence to support his apparent belief that rectal bleeding is not possible without penetration. His analysis appears instead to have been driven by impermissible speculation about the medical implications of Petitioner's testimony. *See Kumar*, 18 F.4th at 1155 (holding that the IJ's speculation about the "force of the beating" and "the medical implications of that force" did not support adverse credibility finding). The IJ's "subjective view of when a person should bleed" is not a substitute "for objective and substantial evidence." *Bandari v. I.N.S.*, 227 F.3d 1160, 1167 (9th Cir. 2000); *see id.* (holding that IJ's speculation that petitioner could not have been beaten with a

rubber hose for 20 minutes without bleeding did not support adverse credibility finding).

The IJ's laser focus on Petitioner's testimony about rectal bleeding led him to ignore the severity of Petitioner's original allegations of PTSD, a broken nose and foot, chronic rib pain, and bloody urination from which he continued to suffer nine years later. *See Shrestha*, 590 F.3d at 1040 (noting that the IJ may not "cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result"). Because Petitioner's original injury allegations were of a severity comparable to long-term rectal bleeding, his testimony did not present a "much different—and more compelling—story of persecution" than his initial application. *See Silva-Pereira*, 827 F.3d at 1185–86, 1188 (upholding adverse credibility determination based in part on petitioner's omission of multiple altercations with the police from his application).

On this record, Petitioner's omission of rectal bleeding from his original application does not support the adverse credibility finding.

### 4.  *Totality of the circumstances*

This case thus presents a familiar pattern: a credibility finding supported by several reasons, some of which withstand judicial scrutiny and one (or sometimes more) that does not. We affirm credibility findings when they are supported by substantial evidence under the "totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii); *Alam v. Garland*, 11 F.4th 1133, 1137 (9th Cir. 2021) (en banc). That standard does not lend itself to a "bright line" rule or a "number-counting analysis" because some factors will weigh more heavily on an applicant's credibility than others. *Kumar*, 18 F.4th at 1155–56. In general, "petitioners carry

a substantial burden to convince us to overturn a Board decision denying relief on credibility grounds, particularly when the Board has adopted multiple bases for its adverse credibility determination." *Li v. Garland*, 13 F.4th 954, 959 (9th Cir. 2021).

Petitioner has not carried his burden to show that the record compels the conclusion that his accounts of the beatings and threats and his denials of gang affiliation were credible. Our post-*Alam* precedents "suggest that falsehoods and fabrications weigh particularly heavily in the adverse credibility inquiry." *Kumar*, 18 F.4th at 1155. The IJ's finding that Petitioner lied about being a gang member strongly supports the adverse credibility finding—especially because Petitioner's denial of gang membership reaches the heart of his claim for relief. *See Aguilar Fermin v. Barr*, 958 F.3d 887, 892 (9th Cir. 2020) (relying on inconsistencies and instances of implausible testimony, "some of which reach the heart of [petitioner's] claim for relief" to affirm adverse credibility determination); *Shrestha*, 590 F.3d at 1046–47 ("Although inconsistencies no longer need to go to the heart of the petitioner's claim, when an inconsistency is at the heart of the claim it doubtless is of great weight.").

The IJ's finding that Petitioner lied about his gang affiliation undermined his testimony about all three incidents of past persecution. It also went to a key element of his withholding of removal claim: his membership in a persecuted group. *See Tamang v. Holder*, 598 F.3d 1083, 1091 (9th Cir. 2010) (setting out the elements of a claim for withholding of removal). Petitioner's falsehood about his gang affiliation and the IJ's demeanor finding together provide sufficient support for the adverse credibility determination. *Cf. Li*, 13 F.4th at 960–61 (affirming adverse credibility finding based on petitioner's submission of false

information about her arrest history and previous employment).[7]

Because substantial evidence supports the agency's adverse credibility determination, we deny the petition as to the withholding of removal claim. *See Manes v. Sessions*, 875 F.3d 1261, 1265 (9th Cir. 2017) (per curiam). As in many cases, the stringent standard of review dictates the outcome here. But nothing in this opinion should be construed as preventing the agency, on remand, from sua sponte reconsidering its adverse credibility determination and the claim for withholding of removal.

## C. *Protection under the Convention Against Torture*

Petitioner also argues that his country-conditions evidence is independently sufficient to establish his eligibility for CAT relief, regardless of the adverse credibility finding. Under the Convention Against Torture, the United States has agreed not to "expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–

---

[7] Petitioner's denial of gang membership was essential to preserve the proposed particular social group most closely related to his allegations of past persecution: young, tattooed males in the Uc family. As the IJ recognized, that group is a proxy for perceived gang members who, unlike actual or former gang members, may constitute a particular social group on the facts of a specific case. *See Vasquez- Rodriguez v. Garland*, 7 F.4th 888, 897–98 (9th Cir. 2021) (recognizing that actual or former gang members could not constitute a cognizable social group as a matter of law but leaving open the possibility that the Board could find that persons incorrectly perceived to be gang members constitute a cognizable social group on the facts of a particular case).

761, 2681–822 (codified as note to 8 U.S.C. § 1231). To establish eligibility for CAT relief, a petitioner must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); *see Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004) (holding that an applicant must "show only a chance greater than fifty percent that he will be tortured if removed"). When considering a CAT application, the agency must consider the "*aggregate* risk" of torture that the applicant would face if returned. *Guerra v. Barr*, 974 F.3d 909, 916 (9th Cir. 2020) (quoting *Cole v. Holder*, 659 F.3d 762, 775 (9th Cir. 2011)).

"Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for [prohibited purposes] . . . by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see Cole*, 659 F.3d at 771 ("'Acts constituting torture' under CAT 'are varied, and include beatings and killings.'" (quoting *Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008))). The acquiescence standard "does not require actual knowledge or willful acceptance of torture; awareness and willful blindness will suffice." *Parada v. Sessions*, 902 F.3d 901, 916 (9th Cir. 2018) (quoting *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705–06 (9th Cir. 2010)).

The regulations implementing the CAT "explicitly require the IJ to consider 'all evidence relevant to the possibility of future torture.'" *Aguilar-Ramos*, 594 F.3d at 705 n.6 (quoting 8 C.F.R. § 208.16(c)(3)). That evidence includes, but is not limited to, evidence of past torture; evidence that "the applicant could relocate to a part of the country of removal where he or she is not likely to be

tortured;" and evidence of "gross, flagrant or mass violations of human rights within the country of removal." 8 C.F.R. § 208.16(c)(3). An applicant may therefore satisfy the burden to receive CAT relief with evidence of country conditions alone. *Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 894 (9th Cir. 2018); *Aguilar-Ramos*, 594 F.3d at 705 (remanding CAT claim where IJ and Board failed to consider country-conditions evidence). Although the agency need not discuss every piece of evidence submitted, it must give "reasoned consideration" to any potentially dispositive evidence. *Eneh*, 601 F.3d at 948–49. That did not happen here.

Petitioner devoted a several-page section of his brief to arguing that the agency had failed to give reasoned consideration to his country-conditions evidence. Rather than respond to Petitioner's well-supported argument, the government mischaracterized it as "perfunctory" in a brief and vague footnote. It has therefore forfeited the opportunity to argue that the Board gave reasoned consideration to Petitioner's country-conditions evidence. *See Parsons v. Ryan*, 949 F.3d 443, 455 n.2 (9th Cir. 2020) (holding argument forfeited due to inadequate briefing). Even putting aside the forfeiture, we conclude that the agency legally erred by failing to give reasoned consideration to potentially dispositive evidence.

### 1. *Petitioner's country-conditions evidence is potentially dispositive*

Petitioner supported his CAT claim with testimony and written statements from two experts, Dr. Howard Campbell and Dr. Jeremy Slack. Both are professors at the University of Texas at El Paso and have expertise on conditions in Mexico relevant to the threat of torture that Petitioner may

face upon return to Mexico. Dr. Campbell testified on the Mexican drug trade and criminal world and on corruption in Mexican law enforcement, based on his 25 years of research experience in Mexico and along the U.S.–Mexico border. Dr. Slack testified as an expert on "the numerous ways people are tracked, investigated and tortured upon removal to Mexico," based on his book on that subject and 12 years of research experience in Mexico and along the U.S.–Mexico border.

Both experts testified that Petitioner was more likely than not to be tortured by Mexican law enforcement or by criminal organizations operating with virtual impunity. Although they discussed some of the incidents about which Petitioner testified, they based their opinions on Petitioner's visible features, record evidence credited by the IJ, and conditions in Mexico. Their opinions did not depend on those portions of Petitioner's testimony that the IJ did not credit. They explained that Petitioner's tattoos clearly denote membership in the Sureños and would likely result in his being targeted by rivals to the Sureños, including police officers allied with rival criminal organizations. Due to pervasive corruption in Mexican law enforcement, criminal organizations torture and kill with impunity, leaving mutilated bodies in public as warnings. Police officers often target individuals with gang-related tattoos for extrajudicial beatings or torture, or deliver them to criminal organizations for interrogation.

Dr. Slack and Dr. Campbell also testified that Petitioner's other undisputed characteristics—namely, being indigenous and Americanized and having mental illnesses and a substance-abuse disorder—put him at greater risk of being kidnapped, extorted, and tortured by law enforcement and criminal organizations. Dr. Slack explained that

Petitioner's mannerisms, speech, and style of dress would broadcast his connection to the United States, making him an attractive target for kidnapping and extortion. He also testified that police officers are sometimes paid to pick up people struggling with mental illness or addiction and to drop them off at "predatory" rehabilitation centers. Dr. Campbell testified that indigenous people are more likely to be mistreated by police officers and criminal organizations. He further explained that many indigenous communities use vigilante justice to expel outsiders and other people whom they perceive as a threat.

In addition to Dr. Slack's and Dr. Campbell's expert testimony, Petitioner submitted extensive documentary evidence about widespread human rights abuses in Mexico. The State Department's 2019 Country Report on Mexico, for example, identified credible reports of "the involvement by police, military, and other government officials and illegal armed groups in unlawful or arbitrary killings, forced disappearance, and torture," among other things. It also reported "the use of physical and chemical restraints, physical and sexual abuse, trafficking, forced labor, [and] disappearance" in mental health institutions and care facilities.

A United Nations report found that indigenous people in Mexico "were more likely to be victims of torture and other cruel, inhuman or degrading treatment when arrested." Numerous articles and reports in the record identified migrants, deportees, indigenous people, and individuals with mental illness or substance-abuse disorders as particularly vulnerable to violence at the hands of criminal organizations and corrupt law enforcement. Petitioner also submitted articles confirming that his cousins were killed by gang members, as well as other articles about deportees with gang

tattoos who were tortured and killed shortly after being returned to Mexico.

We recount only a small sample of the extensive record evidence reporting extreme violence against individuals on the basis of perceived gang affiliation, deportee status, indigenous heritage, mental illness, and substance abuse. Petitioner has all of these characteristics, each of which would independently place him at risk of torture if he were removed to Mexico. The agency was required to consider the aggregate risk of torture arising from all of these risk factors. *See Velasquez-Samayoa v. Garland*, 49 F.4th 1149, 1155–56 (9th Cir. 2022) (remanding in part because agency failed to consider aggregate risk of torture from petitioner's alternative and distinct theories of torture). If the Board had accorded Petitioner's expert testimony and country-conditions evidence any weight, it could have concluded that, if Petitioner were removed, his combination of risk factors would give him a greater than fifty percent likelihood of being "individually and intentionally singled out" by criminal organizations or Mexican law enforcement for harsh treatment amounting to torture. *Eneh*, 601 F.3d at 949 (quoting *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007)).

### 2. *The agency failed to give reasoned consideration*

Against this backdrop, the Board dismissed Petitioner's country-conditions evidence with a single sentence: "Evidence of the general possibility of torture does not meet the applicant's burden of establishing that it is more likely than not that *he* will be targeted for such treatment."[8] While

---

[8] The Board also agreed with the IJ that Petitioner could safely relocate within Mexico, which the Board correctly recognized is one factor that

the Board's statement is true as a general principle, it bears little relationship to the evidence actually submitted in this case.

*Expert Testimony.* Petitioner's expert witnesses testified, based on their expertise and his characteristics, that he is more likely than not to be tortured upon removal to Mexico. Both Dr. Campbell and Dr. Slack assessed the aggregate risk of torture that Petitioner would face if he were removed to Mexico. They explained how Petitioner's combination of traits would make him a particularly attractive target for criminal organizations, corrupt members of law enforcement, and indigenous vigilantes. Nothing in the record contradicts their testimony. To the contrary, the record tends to corroborate their opinions about the risks that Petitioner faces. The Board did not mention or engage with this considerable evidence of the likelihood that Petitioner would face torture upon removal to Mexico. That is a strong indication that the Board did not fulfill its obligation to "consider all of the evidence before it." *Udo v. Garland*, 32 F.4th 1198, 1205 (9th Cir. 2022) (quoting *Cole*, 659 F.3d at 771–72) (remanding where petitioner's documentary evidence was highly probative of the key factual issues and contradicted the agency's ultimate conclusion).

---

the agency must consider, *Maldonado v. Lynch*, 786 F.3d 1155, 1164 (9th Cir. 2015) (en banc). That statement, too, fails for all the reasons stated in text: the evidence discussed in the previous section was potentially dispositive with respect to relocation, and the Board failed to give the evidence reasoned consideration. We also observe that, before us, the government has declined to defend the Board's flawed relocation finding, thus forfeiting any argument that the relocation determination affects our analysis of the CAT claim. *See Seven Words LLC v. Network Sols.*, 260 F.3d 1089, 1097 (9th Cir. 2001); *United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007).

To the extent that the Board relied on the IJ's analysis of Dr. Campbell's and Dr. Slack's testimony, its reliance was erroneous. The IJ relied on purported inconsistencies within and between the experts' testimony and the record evidence, none of which is supported by the record. For example, the IJ mischaracterized Dr. Campbell's and Dr. Slack's testimony as in conflict regarding the relationship between law enforcement and gang members. Dr. Slack testified that law enforcement agencies selectively enforce based on their allegiance to different drug cartels, corroborating Dr. Campbell's testimony that law enforcement is too corrupt to enforce the law effectively against the drug cartels. The IJ also thought that Dr. Campbell's testimony about the Mexican government's attitude toward indigenous people was inconsistent with the existence of indigenous vigilante violence. We do not see the inconsistency. State-sponsored discrimination against indigenous people can coexist with, or even explain, indigenous vigilante violence. In fact, the record suggests that some vigilante violence is a product of frustration about law enforcement's failure or refusal to defend indigenous people from gang violence.

One other flaw in the IJ's analysis warrants close scrutiny. The IJ mischaracterized a survey finding that seven percent of deportees are *reported* kidnapped as showing that only seven percent of deportees *are* kidnapped. Dr. Slack's statement, which is corroborated by other documentary evidence, explains that the seven percent figure is likely a gross understatement of the percentage of deportees who are kidnapped. According to Mexico's census bureau, approximately 98% of kidnappings go unreported due to distrust of law enforcement. In other words, the actual percentage of kidnapped deportees is likely much higher.

The IJ put undue weight on that seven percent figure in another way, too. Although seven percent is far lower than the fifty percent likelihood of torture that Petitioner had to show to obtain CAT relief, kidnapping is only one of many kinds of mistreatment that may qualify as, or result in, torture. Also, his status as a deportee is only one of the risk factors for Petitioner.

We remanded a petitioner's CAT claim to the Board on strikingly similar facts in *Cole*. The petitioner there claimed that his race and gang-related tattoos made it more likely than not that he would be tortured if he were removed to Honduras. 659 F.3d at 765–66. He supported his CAT claim with evidence comparable to that submitted by Petitioner here: testimony from two experts, both of whom agreed that he was likely to be tortured if removed, and "extensive" documentary evidence of widespread human rights abuses in Honduras. *Id.* at 766–69. We remanded the petitioner's CAT claim because the Board mischaracterized the record with regard to one expert's testimony and failed even to acknowledge the other expert. *Id.* at 772–73.

Here, the Board's analysis was even more perfunctory than its analysis in *Cole*, where the Board's order demonstrated that it had at least considered the testimony of one of the petitioner's experts. Although the Board was not compelled to accept Dr. Slack's or Dr. Campbell's testimony, it was required to consider it and to state "reasons in the record why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief." *Aguilar-Ramos*, 594 F.3d at 706 n.7; *Cole*, 659 F.3d at 772. It did not. And the reasons that the IJ gave for disregarding the experts' estimates of Petitioner's likelihood of being tortured in Mexico mischaracterized that evidence and were not supported by substantial evidence.

*Documentary Evidence.*   The Board also erred by disregarding Petitioner's documentary evidence that the Mexican government participates or acquiesces in "gross, flagrant or mass violations of human rights," 8 C.F.R. § 208.16(c)(3)(iii), against gang-affiliated individuals, deportees, indigenous people, and individuals with mental illness or substance-abuse disorders.  Some of that evidence comes in the form of Country Reports, to which we accord "special weight in removal proceedings." *Aguilar-Ramos*, 594 F.3d at 705 & n.6 (remanding because Board "failed to consider the Country Report at all").  There is no indication here that the Board gave any weight to the Country Reports in the record, much less the "special weight" that our precedent requires.

Moreover, we have cautioned the Board against treating similar documentary evidence as too general to show a particularized threat of torture. *See, e.g.*, *Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009) ("Widespread mistreatment of a certain group of people may well be relevant to an applicant's claim that he faces a clear probability of torture upon return, depending upon the facts of the case.").  Evidence that the government intentionally targets or acquiesces in the targeting of a specific group to which an applicant belongs is sufficiently particularized. *See, e.g.*, *De Leon v. Garland*, 51 F.4th 992, 1006–07 (9th Cir. 2022) (remanding where IJ failed to meaningfully engage with country-conditions report detailing "widespread institutional corruption" in Guatemala's police force); *Guerra*, 974 F.3d at 915–16 (concluding that the IJ could plausibly infer from country-conditions evidence about the discrimination that mentally ill or intellectually disabled individuals face in Mexico's criminal justice system that petitioner's schizophrenia and seizure disorder, in addition

to his inability to care for himself, would make him likely to attract attention of the police and to endure severe pain or suffering in their custody); *Parada*, 902 F.3d at 916 ("Evidence showing widespread corruption of public officials . . . can be highly probative" of acquiescence.); *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1283 (9th Cir. 2001) (remanding where the Board failed to "consider the documented country conditions in Sri Lanka which corroborate the widespread practice of torture against Tamil males").[9]

The IJ's analysis of Petitioner's documentary evidence was no better.  He dismissed Petitioner's documentary evidence of gross, flagrant, and mass violations of human rights in Mexico on the theory that "the laws themselves and the constitution itself for that nation [are] fairly progressive." The IJ appears to have relied on Dr. Campbell's testimony characterizing Mexico's laws as "facially progressive."  But in the same breath, Dr. Campbell emphasized that those laws are "seldom enforced," with only two percent of crimes ever being fully prosecuted.  He attributed that low enforcement

---

[9] Both cases that the government cites in support of the Board's characterization of Petitioner's country-conditions evidence are inapposite.  In *Wakkary v. Holder*, the petitioner presented some evidence that torture occurred in Indonesia but no evidence that it was used against members of the Chinese Christian minority to which he belonged.  558 F.3d 1049, 1068 (9th Cir. 2009).  In *United States v. Reyes-Bonilla*, the petitioner "presented no evidence of relevant country conditions in Guatemala in 2001, much less that flagrant violations of human rights were widespread there." 671 F.3d 1036, 1051–52 (9th Cir. 2012).  Petitioner's significant evidence that criminal organizations and Mexican law enforcement routinely torture individuals similar to him in multiple respects is far stronger than the inadequate evidence presented in *Wakkary* and *Reyes-Bonilla*.

rate to what he said was the corrupt, lazy, and racist nature of the Mexican justice system.

The record supports Dr. Campbell's testimony on these points, with one report by the Inter-American Commission on Human Rights estimating that "more than 98% of crimes committed in Mexico remain in impunity" due to structural and systemic corruption. Every reference in the record to Mexico's constitution describes the Mexican government's failure to protect rights that it formally guarantees, especially for low-income individuals, indigenous people, and migrants. We do not see how facially progressive laws that are seldom enforced by notoriously corrupt members of law enforcement undermine the evidence that kidnapping, forced disappearance, torture, and murder are common throughout Mexico. "That a country's constitution prohibits torture does not establish that the country does not torture people." *Cole*, 659 F.3d at 772 n.8.

Petitioner has offered evidence of many reasons why he would probably be tortured if he were removed to Mexico. "In the face of persuasive evidence, the agency's dismissive, fleeting reference to that evidence is insufficient and falls far short of the agency's obligation to give 'reasoned consideration' to the evidence." *Udo*, 32 F.4th at 1205. Although we do not reach whether the record compels CAT relief, Petitioner's expert testimony and documentary evidence are too strong to be dismissed in a single sentence invoking an inapt general principle, or by reliance on paper rights that are not actually enforced. Further, the IJ's conclusion that Mexico's challenges do not rise to the level of "gross, flagrant or mass violations of human rights" is plainly inconsistent with a fair reading of the record. We must therefore remand Petitioner's CAT claim to the agency for further consideration in light of the expert testimony and

the corroborating documentary evidence. *See De Leon*, 51 F.4th at 1006 (remanding for failure to give reasoned consideration to potentially dispositive evidence); *Cole*, 659 F.3d at 773 (same); *Aguilar-Ramos*, 594 F.3d at 705 (same); *Eneh*, 601 F.3d at 948–49 (same).

We **GRANT** Uc Encarnacion's petition for review as to his CAT claim and **DENY** his petition for review as to his withholding of removal claim. We **REMAND** this case for further proceedings consistent with this opinion.

---

Bumatay, J., dissenting:

Uc Encarnacion became a fugitive from justice when, almost immediately after filing this petition for review, he failed to appear at a mandatory immigration custody hearing and then disappeared. That course of conduct falls squarely within the fugitive disentitlement doctrine and so we should dismiss his petition.

I respectfully dissent.

## I.

### The Fugitive Disentitlement Doctrine

This case cries out for application of the fugitive disentitlement doctrine. In 2020, Uc Encarnacion was ordered removed from the United States under a reinstated removal order. After expressing a fear of returning to Mexico, he was placed in withholding-only proceedings. In September 2022, the Board of Immigration Appeals ("BIA") denied him withholding of removal and CAT protection after concluding he lacked credibility. On September 26, 2022, Uc Encarnacion's counsel filed this petition for review. But

just one week later, on October 3, 2022, Uc Encarnacion failed to appear at an immigration custody hearing and has evaded the government ever since.

Back in 2020, over the government's objection, an immigration judge granted Uc Encarnacion release on bond from immigration custody. But in June 2022, the BIA vacated that bond order, holding that Uc Encarnacion should have remained detained because he posed a danger to the community. Following the BIA's ruling, Uc Encarnacion was notified that he was ordered to appear for an appointment with immigration authorities in August 2022. Uc Encarnacion never showed up.

At first, he fought custody through legal channels. Uc Encarnacion filed a habeas petition in federal district court to prevent his re-detention. The district court ultimately denied him any relief. *See Uc Encarnacion v. Kaiser*, 2022 WL 9496434, at *1 (N.D. Cal. 2022). He was then ordered to appear before his immigration officer for a custody redetermination on October 3, 2022. Both Uc Encarnacion and his attorney received notice of this hearing, with his attorney confirming receipt.

Left without legal remedies, Uc Encarnacion took matters into his own hands. He simply failed to appear at the October 3 immigration hearing. Instead, he absconded and remains at large to this day. Worse still, he has seemingly continued his lawbreaking. According to the government, and his counsel doesn't dispute, Uc Encarnacion was arrested in San Francisco in September 2024 on serious weapons and assault charges.

Today, we have little information on his whereabouts. His appellate counsel doesn't represent that she is in *current* contact with Uc Encarnacion and she didn't give this court

any information on his precise current location. Appellate counsel also has not spoken to Uc Encarnacion about his recent offenses or why he absconded two years ago. Indeed, we don't even know when appellate counsel last spoke to Uc Encarnacion. All this uncertainty despite being given ample opportunity to explain his current situation.

## A.

The fugitive disentitlement doctrine is a longstanding equitable principle that permits us to decline review when the party seeking relief becomes a "fugitive" while the appeal is pending. *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993) ("It has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal."). This authority flows from the courts' inherent power "to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996), *superseded by statute on other grounds by* 28 U.S.C. § 2466. We recently reaffirmed that principle, noting that the fugitive disentitlement doctrine "is discretionary and grounded in equity" but remains "a severe sanction that we do not lightly impose." *United States v. Terabelian*, 105 F.4th 1207, 1214 (9th Cir. 2024) (simplified).

The doctrine serves several rationales. First, it "prevent[s] the entry of unenforceable judgments against absent" defendants. *Id.* (simplified). Second, it blocks escapees from "call[ing] upon the resources of the Court for determination of [their] claim[s]." *Id.* (simplified). Third, it "serve[s] an important deterrent function." *Id.* (simplified). And finally, it "advances an interest in efficient, dignified appellate practice." *Id.* (simplified).

Although the doctrine originated in the criminal context, it should perhaps apply with greater force in the immigration context. After all, immigration custody isn't criminal custody and does not carry the same heightened due process concerns. And "[a]s a matter of text, structure, and history, Congress may authorize the government to detain removable aliens throughout their removal proceedings." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1214 (9th Cir. 2022) (Bumatay, J., concurring). So the government's interest is at its highest in detaining illegal aliens.

Indeed, the doctrine serves the same interests in both the criminal and immigration context. "Like the fugitive in a criminal matter, the alien who is a fugitive from a deportation order should ordinarily be barred by his fugitive status from calling upon the resources of the court to determine his claims." *Zapon v. U.S. Dep't of Justice*, 53 F.3d 283, 285 (9th Cir. 1995) (simplified). Enforcing the doctrine in immigration cases also "furthers its punitive and deterrent purposes." *Antonio-Martinez v. INS*, 317 F.3d 1089, 1093 (9th Cir. 2003). After all, "[t]hose who disregard their legal and common-sense obligation to stay in touch while their lawyers appeal an outstanding deportation order should be sanctioned. The prospect of disentitlement provides a strong incentive to maintain contact with the INS and counsel, rather than taking one's continued presence in the country for granted." *Id.*

So it's no wonder that every circuit to consider the question—including our own—has recognized that the fugitive disentitlement doctrines applies to immigration appeals. *See id.* at 1092 ("the doctrine applies in immigration cases as well"); *see also Bar-Levy v. U.S. Dep't of Justice*, 990 F.2d 33, 35 (2d Cir. 1993) ("Although an alien who fails to surrender to the INS despite a lawful order

of deportation is not, strictly speaking, a fugitive in a criminal matter, we think that he is nonetheless a fugitive from justice."); *Arana v. INS*, 673 F.2d 75, 76–77 (3d Cir. 1982) (per curiam) (dismissing appeal of alien who ignored a deportation order and could no longer be located); *Giri v. Keisler*, 507 F.3d 833, 835 (5th Cir. 2007) ("[W]e now find it proper to extend the fugitive disentitlement doctrine to the immigration context where . . . the petitioners are fugitive aliens who have evaded custody and failed to comply with a removal order."); *Sapoundjiev v. Ashcroft*, 376 F.3d 727, 729 (7th Cir. 2004) ("[A]nyone who is told to surrender, and does not, is a fugitive."); *Martin v. Mukasey*, 517 F.3d 1201, 1204 (10th Cir. 2008) ("[W]e follow their lead and sound logic in holding that the fugitive disentitlement doctrine applies in immigration appeals.").

## B.

Evading immigration custody is the very definition of being a "fugitive." While Uc Encarnacion didn't physically escape from detention, his failure to surrender to immigration authorities placed him in default of his legal obligations and renders him subject to the fugitive disentitlement doctrine. As we have recognized, "[a]n alien subject to a stayed deportation order is no different from a criminal defendant on bail pending appeal." *Antonio-Martinez*, 317 F.3d at 1093. Such individuals remain under the court's authority and "must surrender any time the court deems it appropriate." *Id*. That "heightened obligation" requires maintaining contact with counsel and immigration authorities and complying with orders to appear. *Id*. When an alien instead absconds, he forfeits the right to invoke appellate review.

Failure to appear at an immigration proceeding is itself enough to trigger the fugitive disentitlement doctrine. As the Second Circuit has held, "for an alien to become a fugitive, it is not necessary that anything happen other than a bag-and-baggage letter be issued and the alien not comply with that letter." *Gao v. Gonzales*, 481 F.3d 173, 176 (2d Cir. 2007). The Third Circuit has also explained that "violation of an immigration agency's order to appear is sufficiently connected to a fugitive's petition for review of a final order of removal to allow for dismissal under the doctrine." *Galeas Figueroa v. Att'y Gen. U.S.*, 998 F.3d 77, 85 (3d Cir. 2021). Even failing to notify the agency of a change of address may suffice. *Antonio-Martinez*, 317 F.3d at 1093; *Arana*, 673 F.2d at 76–77 (dismissing petition when alien "apparently" concealed himself by failing to update his address). And even when authorities know where an alien lives, refusal to surrender still renders him "a fugitive in the sense that the INS must deploy resources to bring him in." *Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996). In a Seventh Circuit case, Judge Easterbrook put it this way:

> That agents may be able to locate an absconder does not make him less a fugitive. Likewise a prisoner who walks away from a camp that lacks walls has committed the crime of escape, even if it is easy to track him down—indeed, even if he returns before he is missed. A corporate executive who fails to report at the start of a sentence for antitrust offenses is a fugitive, and his appeal will be dismissed, even if it turns out that he has been relaxing at his country estate and does not plan to put up a fight when apprehended. Just so with an alien who, by failing to report as

ordered, retains the option of going underground if the judicial decision is adverse.

*Sapoundjiev*, 376 F.3d at 729 (simplified).

Thus, Uc Encarnacion plainly qualifies as a fugitive under the doctrine. The BIA ordered him to surrender to immigration custody as a danger to the community. A federal district court declined to intervene. Uc Encarnacion was notified of his obligation to show up at an immigration proceeding to determine his custodial status. Out of options, the only proper choice was for Uc Encarnacion to attend the hearing. Instead, he failed to do so—barely a week after he filed his petition for review in this court. Since then, he has failed to inform immigration authorities of his whereabouts. Even today, when his fugitive status is squarely at issue, Uc Encarnacion hasn't voluntarily surrendered to immigration authorities or notified them of his location. Nor has he notified this court of his location or whether he intends to comply with this court's orders. His appellate counsel hasn't offered this court any reassurances either. By his own conduct, Uc Encarnacion has placed himself "beyond the jurisdiction of the court." *Antonio-Martinez*, 317 F.3d at 1093.

## C.

And the rationales animating the fugitive disentitlement doctrine warrant its application here.

First, one who flouts the authority of the judiciary forfeits the privilege of its review. As the Supreme Court has explained, "an appellate court may employ dismissal as a sanction when a defendant's flight operates as an affront to the dignity of the court's proceedings." *Ortega-Rodriguez*,

507 U.S. at 246. Such flight is "tantamount to waiver or abandonment" of appellate rights. *Id.* at 240. Petitioners who invoke our jurisdiction must accept "the bitter with the sweet": they cannot seek to "overturn adverse judgments while insulating themselves from the consequences of an unfavorable result." *Antonio-Martinez*, 317 F.3d at 1093. The sanction of dismissal prevents that distortion and preserves the dignity of the courts by ensuring that those who scorn judicial authority cannot simultaneously demand its protection.

Uc Encarnacion's conduct illustrates precisely why the doctrine exists. He has repeatedly sought to exploit judicial process to avoid detention and delay removal. He invoked habeas to block his immigration custody order, and when that effort failed, he simply refused to appear as directed. His actions show a willingness to use the courts as a shield while giving no indication he will honor their judgments. That is the very abuse of judicial process—and affront to this court's dignity—that the doctrine is designed to prevent.

Second, dismissal is warranted by enforceability concerns. When a petitioner absconds, "any judgment may be difficult, if not impossible, to enforce." *Sapoundjiev*, 376 F.3d at 729. Flight frustrates the execution of judgment should the government prevail, and the fugitive disentitlement doctrine exists precisely to prevent appellate courts from issuing decisions that "could not be enforced." *United States v. Gonzalez*, 300 F.3d 1048, 1051 (9th Cir. 2002). That concern is hardly theoretical here. No one knows for sure where Uc Encarnacion is or whether he'll comply with any court order. Even though he had counsel in the habeas proceedings, he defied the district court's directive to report to immigration custody. So counsel's representations can't guarantee enforceability of our

judgment. And his arrest for serious violent felonies while a fugitive only heightens concerns about his noncompliance with court orders and, more importantly, the danger he poses to the community.

Finally, deterrence and efficiency concerns independently support dismissal. As mentioned, the fugitive disentitlement doctrine "serves an important deterrent function and advances an interest in efficient, dignified appellate practice." *Ortega-Rodriguez*, 507 U.S. at 242. It is not "an arbitrary response to the conduct it is supposed to redress or discourage," *Degen*, 517 U.S. at 828, but a necessary sanction that "sends a clear message to similarly situated litigants—flee the effect of a judgment and the privilege of challenging that judgment vanishes with you." *Gao*, 481 F.3d at 177.

Permitting Uc Encarnacion's petition to go forward despite his disappearance would allow him to play a game of "heads I win, tails you'll never find me." *Id.* He wins either by persuading the majority to rule in his favor or by absconding from immigration authorities. This is exactly the wrong message: that fugitives may flee with impunity, secure in the knowledge that their appeal remains intact and subject to enforcement only if they are unlucky enough to be apprehended. Such a rule erodes deterrence and compromises the efficient, dignified operation of the appellate process.

For all these reasons—the equitable imperative of preserving the dignity of the courts, together with the pragmatic concerns of enforceability, deterrence, and the efficient operation of the appellate process—we should have dismissed Uc Encarnacion's petition for review.

## D.

The majority rejects the fugitive disentitlement doctrine on dubious grounds.

First, the majority asserts that Uc Encarnacion's whereabouts are known to "his counsel, DHS, and the court." That's news to me. The majority bases this sweeping claim on its own *sua sponte* foray into the internet. Citing its recent check of a publicly accessible "Find a person in jail" database maintained by the San Francisco's Sheriff's Office, the majority declares that Uc Encarnacion "is still in the San Francisco Jail with no release date set."

But this is a stretch based on improper factfinding. Appellate judges don't conduct factual investigations—let alone rest a dispositive ruling on them. *See Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) ("Factfinding is the basic responsibility of district courts, rather than appellate courts."); *Icicle Seafoods v. Worthington*, 465 U.S. 709 (1986) ("[T]he Court of Appeals . . . should not simply have made factual findings on its own."). Even if the majority's online sleuthing is accurate, all we know is that Uc Encarnacion was arrested in San Francisco in September 2024 on a litany of firearms and assault charges. Notably, the majority doesn't actually identify where he is, despite its confident assertion.

And that Uc Encarnacion may be engaged in even more serious criminal conduct should be a big reason *to grant dismissal*. But the majority twists his alleged continued criminality into a factor in his favor. Think about the incentives the majority endorses—flee, commit more crimes, and the Ninth Circuit will look the other way. As my colleague once remarked, "How can this be? I feel like I am taking crazy pills." *United States v. Begay*, 934 F.3d

1033, 1042 (9th Cir. 2019) (Smith, N.R., J., dissenting) (simplified).

Indeed, even if Uc Encarnacion is in state custody, that provides no assurance, especially in light of California's sanctuary laws, that the government can locate him, that he will eventually be returned to immigration custody, or that he will comply with this court's orders. His counsel never made any of those assurances. Instead, counsel only vaguely stated that she has been in contact with him "periodically." That guarantees nothing. If we were to deny his petition for review, we should have no confidence that he would comply with our judgment.

So this case is nothing like *Mamigonian v. Biggs*, on which the majority relies. 710 F.3d 936, 940–41 (9th Cir. 2013). In *Mamigonian*, we declined to apply the fugitive disentitlement doctrine even though the petitioner failed to appear for her scheduled deportation flight. *Id*. But there, the petitioner did not vanish. After our court ordered briefing on application of the doctrine, the petitioner got "in contact with ICE" and allowed the government to "electronically track[] her whereabouts." *Id*. at 940. So the government knew exactly where she was and our court was assured that our judgment could be enforced. We have none of those assurances here. Uc Encarnacion hasn't voluntarily turned up—neither he nor his counsel has disclosed his precise whereabouts to the government. Indeed, the only reason any information surfaced was because he was arrested for other crimes. He did not step forward—he was dragged back. He did not make himself known; he was caught. And even then, we don't know exactly where he is in custody or if the government would have access to him. Thus, *Mamigonian* bears little resemblance to this case.

Second, the majority rejects the doctrine here because the government raised it "too late." But the government's attorney learned of Uc Encarnacion's fugitive status recently—when inquiring whether immigration authorities had reopened his case. Given the behemoth that is the federal government and the millions of illegal aliens in the immigration system—this is understandable. It would be silly to grant a fugitive a huge windfall simply because of poor communication between two executive agencies. Indeed, the majority ignores that the fugitive disentitlement issue only came up at oral argument in *Mamigonian* and so we ordered supplemental briefing on the issue *after argument*. *Id.* at 940. So the majority's timing argument is an outlier. The majority only encourages more fugitive aliens—letting them know they may abscond without consequence so long as bureaucratic inefficiencies continue.

Finally, the majority suggests that the equities tilt in Uc Encarnacion's favor because he is likely to obtain CAT relief. But that puts the cart before the horse. This doctrine precludes our review of the merits. And so it would be improper to consider the merits in declining to adopt disentitlement. And it again just gives fugitive aliens perverse incentives—if you think you can win your case before the Ninth Circuit, you don't have to show up to government proceedings. This is not the right message to send.

## II.

Uc Encarnacion has forfeited his right to review. We should have dismissed his petition under the fugitive disentitlement doctrine.